Filed 6/21/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042316 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SM980198) |
| v. | |
| NORMAN WILLOVER, | |
| Defendant and Appellant. | |

## I.     INTRODUCTION

In 1999, defendant Norman Willover was sentenced to two consecutive terms of life without the possibility of parole (LWOP) for crimes he committed as a juvenile. In 2014, defendant filed a petition for recall and resentencing pursuant to Penal Code section 1170, subdivision (d)(2).[1] After a hearing, the trial court denied his resentencing petition. On appeal, defendant claims the trial court erroneously denied his petition based solely on the circumstances of his crimes and that the relevant factors weighed in favor of recall and resentencing. For reasons that we will explain, we will affirm the trial court's order.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

## II.     BACKGROUND

### A.     *The Underlying Offenses*

#### 1.     **Facts**

The following summary of defendant's underlying offenses is taken from this court's nonpublished opinion (*People v. Willover* (Oct. 19, 2000, H019899)), issued after he appealed from his convictions.[2]

In December of 1997, defendant, age 17, was living in a residential treatment center in Provo, Utah.  One day, he left the treatment center without authorization.  He bought a Ruger .22-caliber pistol from a teenager in Pleasant Grove, Utah.  He then left for the Monterey area, with the gun in his black backpack.  He stated that he planned to use the gun to rob and kill people and to settle scores with rival gangs.

When defendant arrived in Monterey on January 31, 1998, he obtained ammunition for his gun and loaded it.  Later that day, defendant got together with Joseph Manibusan, Adam Tegerdal, and Melissa Contreras.  The four young people drove around the Monterey area in Tegerdal's Mercury Cougar.  Defendant had the gun, bullets, and clips in his backpack.

Defendant and Manibusan discussed robbing someone.  Manibusan directed Contreras, who was driving, where to go.  He told her to pull over near the Monterey Sports Center.  Defendant and Manibusan left the vehicle with the gun, saying they had seen someone with a purse.  They returned shortly, saying they could not find the person they had been looking for.

Manibusan then took over driving.  He drove onto the Monterey Wharf, where Priya Mathews and Jennifer Aninger were drinking coffee and talking.  Defendant and Manibusan discussed whether the women had a purse.  Defendant yelled out to the

---

[2] On our own motion, we take judicial notice of the prior opinion in *People v. Willover, supra,* H019899.  (Evid. Code, § 452, subd. (d)(1).)

2

women, "Give me your money." The women could not hear him, however. Defendant said something vulgar and then fired nine shots at the two women. Four bullets hit Mathews and two bullets hit Aninger.

Mathews was hit in her upper arm, thigh, and the middle of her back. The bullet that entered the middle of her back punctured her lungs, aorta, and heart. She died at the scene.

Bullets entered Aninger's brain and left arm but she survived. She had three operations on her brain, and as a result of the shooting she lost her senses of smell and taste. She had no use of her left arm until after surgery several months later, which enabled her to regain only some use of the arm.

After defendant shot Mathews and Aninger, Manibusan drove the car to Tegerdal's house, where the group got into Tegerdal's Chevrolet Monte Carlo in order to escape police detection. Along the way, Manibusan told defendant that he "wanted his turn."

Manibusan again drove. He handled defendant's pistol and asserted that he wanted to find someone to rob. He drove to Salinas and then to Seaside, where he noticed Frances Olivo walking on the sidewalk.

Defendant asked if Manibusan was going to rob Olivo. Manibusan said yes, drove the car up to Olivo, and motioned her over. Manibusan shot at Olivo about six times, hitting her with three bullets. The bullets entered Olivo's breast, chest, and shoulder. She died at the scene.

On February 4, 1998, a few days after the shootings, defendant gave his backpack to a friend. The gun, clips, and bullets were inside the backpack. Defendant told his friend that the gun was "heated," meaning it was stolen or had been used in a crime. Defendant was arrested that same day.

3

### 2. Convictions and Jury Findings

Defendant was convicted of first degree murder of Mathews and first degree murder of Olivo (§ 187, subd. (a)), attempted premeditated murder of Aninger (§§ 664, 187, subd. (a)), aggravated mayhem (§ 205), and giving false information to a peace officer (§ 148.9, subd. (a)). The charges of first degree murder were brought on the theory that they were "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death." (§ 189.)

The jury found true three special circumstance allegations: multiple murders (§ 190.2, subd. (a)(3)); murder during the commission of attempted robbery (*id.*, subd. (a)(17)); and drive-by shooting (*id.*, subd. (a)(21)). The jury also found that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) and intentionally inflicted great bodily injury or death as a result of discharging a firearm from a vehicle during the commission of a felony or attempted felony (§ 12022.55).

### 3. Sentencing

At defendant's sentencing hearing, held on April 2, 1999, the prosecutor argued that LWOP was the presumptive sentence for a special circumstance murder committed by a 16- or 17-year-old juvenile, pursuant to section 190.5, subdivision (b). The prosecutor advocated for an LWOP sentence, noting that two psychiatric evaluators had concluded defendant was faking symptoms of a mental illness and that a third evaluator had referred to defendant as "the most cold blooded, callous killer." The prosecutor argued that if defendant was given a sentence other than LWOP, "he will come back again looking for someone to kill."

Defendant's trial counsel argued that defendant suffered "from a mental condition that reduced culpability" and that defendant was a "grossly immature" young man who had "little or no ability to control his own aggression." Defendant's trial counsel argued

4

that the crimes "were committed in so close a period of time as to indicate a single period of aberrant behavior" and that defendant had "played a minor or passive role" in the second murder. Defendant's trial counsel noted that defendant had been diagnosed with antisocial personality disorder and that antisocial behavior was commonly seen in young males but that "most people by the time they're in their forties or they're in their fifties do not generally tend to exhibit these tendencies." Defendant's trial counsel requested the trial court impose a sentence that would give defendant "the opportunity to be released from custody at some time during his life if he can demonstrate to the authorities . . . that he is law abiding, that he is able to control himself, and that he does not present a danger to public safety."

In announcing its sentencing decisions, the trial court first rejected defendant's claim that he was suffering from a mental illness that significantly reduced his culpability for the crimes. The trial court noted it had read the letters submitted in support of defendant, which all suggested "[t]hat it would be a miscarriage of justice somehow" if petitioner received an LWOP sentence. The trial court noted that "all of the doctors and the counselors involved in this case over the years" had characterized defendant as argumentative, explosive, controlling, defiant, resistant to feedback, and a danger to society, with poor impulse control. The court described defendant as "a textbook example and the product of poor, indifferent and inadequate parenting," noting that defendant's mother would often "blow up, call him a loser, give him a knife and ask him to kill her." The court believed that "[c]ommon sense dictates that [defendant] must never be allowed the possibility of drawing another breath in freedom."

The trial court ultimately sentenced defendant to two consecutive LWOP terms for the two first-degree murders, a consecutive term of 15 years to life for the attempted premeditated murder, and two consecutive terms of 25 years to life for the allegations that he personally discharged a firearm causing great bodily injury or death. The trial court stayed the terms for the remaining counts and enhancements.

5

### 4. Appeal and Habeas Petitions

Defendant appealed following his convictions, and this court modified the judgment to reflect that defendant's sentence for the attempted premeditated murder was life with the possibility of parole instead of 15 years to life.

On February 28, 2013, defendant filed a petition for writ of habeas corpus in the trial court, alleging that his LWOP sentence violated the Eighth Amendment. That petition was denied on January 13, 2014.

On March 10, 2014, defendant filed a petition for writ of habeas corpus in this court, again arguing that his LWOP sentence violated the Eighth Amendment. This court issued an order to show cause and an order vacating defendant's sentence and remanding the matter for resentencing, holding that defendant was entitled to a new sentencing hearing under *Miller v. Alabama* (2012) 567 U.S. __ [132 S. Ct. 2455] (*Miller*). However, the California Supreme Court granted review in that case. (*In re Willover* (2015) 235 Cal.App.4th 1328, review granted June 24, 2015, S226523 [further action "deferred pending consideration and disposition of a related issue in *In re Alatriste*, S214652, and *In re Bonilla*, S214960 . . . , or pending further order of the court"].)

### B. The Resentencing Petition

#### 1. Section 1170, Subdivision (d)(2)

Section 1170, subdivision (d)(2), enacted in 2012 (Stats. 2012, ch. 828, § 1), provides a procedural mechanism for resentencing of defendants who were under the age of 18 at the time of the commission of their offenses and who were given LWOP sentences. If the defendant has served at least 15 years of the LWOP sentence, he or she may "submit to the sentencing court a petition for recall and resentencing" (§ 1170, subd. (d)(2)(A)(i)), so long as the LWOP sentence was not imposed for an offense in which the defendant tortured the victim or an offense in which the victim was a public safety official (*id.,* subd. (d)(2)(A)(ii)).

6

In the petition, the defendant must describe "his or her remorse and work towards rehabilitation." (§ 1170, subd. (d)(2)(B).) The trial court "shall hold a hearing to consider whether to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced" if it "finds by a preponderance of the evidence that the statements in the petition are true." (*Id.,* subd. (d)(2)(E).) The statute enumerates a number of factors that the trial court may consider, in the exercise of its discretion, when determining whether to grant a petition for recall and resentencing. (*Id.,* subd. (d)(2)(F) & (G).)

The factors that may be considered in determining whether to grant a petition for recall and resentencing "include, but are not limited to, the following: [¶] (i) The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law. [¶] (ii) The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall. [¶] (iii) The defendant committed the offense with at least one adult codefendant. [¶] (iv) Prior to the offense for which the sentence is being considered for recall, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress. [¶] (v) The defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense. [¶] (vi) The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse. [¶] (vii) The defendant has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved with crime. [¶] (viii) The

defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor." (§ 1170, subd. (d)(2)(F).)

If the trial court denies the petition, "the defendant may submit another petition for recall and resentencing to the sentencing court when the defendant has been committed to the custody of the department for at least 20 years." (§ 1170, subd. (d)(2)(H).) The defendant may also file another petition after having served 24 years. (*Ibid*.)

### 2. Defendant's Petition

On April 9, 2014, defendant filed a petition for recall and resentencing pursuant to section 1170, subdivision (d)(2).

Defendant's petition included a narrative statement of remorse and work towards rehabilitation. In the statement, defendant described how he was "very much a child at the time of these crimes" and how, while in prison, he had come to realize that he needed to "acknowledge and take responsibility for [his] poor choices as a youth and to admit [he] had some problems." He apologized to the victims and their families and to the community. Defendant described having gained "a better understanding and insight" into how his drug addiction had contributed to his involvement in the crimes. Defendant described prison life and the activities he had engaged in while incarcerated, which included church services, art and creative writing classes, and various jobs. Defendant noted that he had not had any CDCR-115 disciplinary reports for violent activities in which he was the aggressor, and that he had maintained family ties.

Defendant included the following documents with his petition: a "chrono" indicating he had been attending bi-weekly Alcoholics Anonymous and Narcotics Anonymous meetings for the past six months; a certificate from a prison ministry indicating his completion of a correspondence course; letters of recommendation from his supervisors at the prison law library; certificates of achievement showing his completion of vocational machine shop classes; a copy of the associates degree in Bible Studies he had earned and a copy of his certificate of Bible Missions; documents showing

he was a member of the Man's Advisory Council; a memorandum about the Enhanced Program Facility program; and "laudatory chronos" from 13 correctional officers, two correctional sergeants, two correctional lieutenants, a captain's secretary, and a chaplain.

### 3. The People's Initial Reply

The People's initial reply to the petition was filed on August 22, 2014. The People acknowledged that defendant was eligible for a hearing and entitled to the appointment of counsel.

### 4. Defendant's Brief

Through counsel, defendant filed a "Resentencing Brief" on January 2, 2015. Defendant noted that there was not yet any case law concerning the application of the section 1170, subdivision (d)(2)(F) factors. Defendant argued that under *Miller, supra,* 567 U.S. __ [132 S. Ct. 2455] and *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), "LWOP sentences for juvenile offenders should be meted out only in the rarest of circumstances" and that the prosecution should have the burden to show that defendant was " 'the rare juvenile offender whose crime reflects irreparable corruption.' "

Defendant argued that seven of the eight factors specified in section 1170, subdivision (d)(2)(F) applied to him.[3] First, defendant's convictions were "pursuant to felony murder or aiding and abetting murder provisions of law." Second, defendant did not have prior juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims. Third, defendant committed the offense with at least one adult codefendant. Fourth, there was evidence that as a child, defendant had been "shuttled from home to home, placement to placement, and was suffering from psychological trauma and significant stress." Fifth, defendant's

---

[3] Defendant did not argue that there was evidence of the eighth factor: that he suffers from "cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense." (See § 1170, subd. (d)(2)(F)(v).)

9

rehabilitative efforts in prison and Statement of Remorse showed that he was remorseful. Sixth, defendant had maintained family ties or connections with others through letter writing, calls, or visits, or had eliminated contact with individuals outside of prison who are currently involved with crime; evidence of this would be presented at the hearing. Seventh, defendant had no disciplinary actions for violence in the last five years; his last one had been in 2007, and he had not been deemed to be the aggressor.

A psychiatric discharge summary from the Heritage Center in Utah was attached to defendant's brief. Defendant had entered the facility on November 16, 1997 and had absconded on December 15, 1997. His diagnoses included schizoaffective disorder, conduct disorder, and polysubstance dependence.

A report written by correctional consultant Daniel J. Fulks was also attached to defendant's brief. Fulks had reviewed defendant's prison files and found no evidence of criminal or gang activity, which is rare for those serving LWOP sentences. Defendant had only nine disciplinary reports, again "far better" than most inmates serving LWOP sentences. LWOP inmates also rarely participate in higher education courses or self-help groups. Defendant was deemed to be a "Low Risk" to the public pursuant to a risk assessment conducted by the Department of Corrections and Rehabilitation.

### 5. The People's Opposition

On January 2, 2015, the People filed opposition to defendant's petition. The People reviewed the factors listed in section 1170, subdivision (d)(2)(F). The People emphasized that defendant was "the actual shooter" in the Mathews murder and that defendant intended to kill her. The People asserted defendant was not convicted of that murder based on a felony-murder theory even though a felony murder special circumstance allegation was found true. Although he was not the actual shooter in the Olivos murder, he was "the leader of th[e] joint expedition" to commit robberies and shoot victims who did not comply and he had supplied the gun and bullets used to kill Olivos. The People acknowledged that defendant had not suffered any felony juvenile

10

adjudications before the murders and that defendant had committed the murders with an adult codefendant, Manibusan, who had been sentenced to death. (See *People v. Manibusan* (2013) 58 Cal.4th 40.)

The People were "unaware" of evidence showing that defendant suffered from any psychological or physical trauma or significant stress at the time of the murders. Defendant had been found competent to stand trial, and psychiatric evaluators had concluded he was sane at the time of the murders. One examiner thought it was likely that defendant was fabricating symptoms of a severe psychiatric disorder in an effort to avoid a long prison term.

The People acknowledged that defendant had taken advantage of programs while incarcerated in prison and that defendant had no disciplinary history in the past five years for violent actions. The People did not know whether defendant had maintained family ties or eliminated contact with criminals outside of prison.

The People asserted that the trial court should consider that defendant had been "convicted of multiple murders and one count of attempted murder," that the two murders had involved "great violence" and had been "particularly viscous [*sic*] and callous," and that defendant had induced others to participate in the crimes and taken a position of leadership or dominance. The People also asserted that the trial court should consider the feelings of the surviving victim and the victims' families.

The People's opposition included the following attachments: the information showing all of the charges against defendant and Manibusan; this court's opinion affirming defendant's convictions and modifying the judgment; the transcript from defendant's sentencing hearing; bill analyses of Senate Bill 9, which enacted section 1170, subdivision (d)(2); the probation report prepared in defendant's case; a copy of the California Supreme Court's opinion affirming the judgment in Manibusan's case; two 1998 psychiatric evaluations of defendant; and letters from Aninger and relatives of Aninger and Mathews.

11

### 6. The Hearing

On January 9, 2015, the trial court held a hearing on defendant's petition for recall and resentencing. Defendant's counsel indicated he was prepared to submit on the briefing. The trial court asked if there was evidence that defendant had maintained family ties. Defendant's counsel noted that several members of defendant's family were in court. Defendant's stepfather and mother introduced themselves, and defendant's stepfather indicated that "church members and family friends" were also present.

The trial court noted it had reviewed the parties' papers, including the attachments. The court referenced defendant's "rehabilitative efforts" including the various groups and programs he had participated in. The court also referenced the lack of "violent disciplinary actions" taken against defendant and discussed the correctional consultant's report. The trial court offered defendant the opportunity to submit any other argument or evidence relating to the statutory factors or the "catch-all factor."

Defendant's counsel argued that the People's opposition focused "entirely upon the circumstances of the crime," but claimed, "this factor is of minimal importance in weighing whether or not [defendant] should be resentenced." Defendant's counsel argued that the issue was not whether defendant's crimes were heinous but whether or not defendant was "irretrievably corrupt or depraved so that there is no possibility that he could be rehabilitated."

The prosecutor responded by arguing that the nature of defendant's crimes "has to be a factor," that the trial court had "discretion to decide how much of a factor it is," and that the facts of the crimes should be "a significant factor" in this case.

The trial court noted that it had read some of the pertinent case law and discussed *Miller, supra,* 567 U.S.__ [132 S. Ct. 2455], in which the defendant had been "a true aider and abettor" and had been under the influence at the time of the crimes. The trial court indicated it did not believe the circumstances of defendant's crimes were similar to those of the *Miller* defendant. The trial court discussed the evidence defendant knew that

12

Manibusan was going to shoot Olivo, and the evidence that defendant intended to kill Mathews and Aninger. The trial court acknowledged defendant's "efforts at rehabilitation" and "good conduct while in custody." The trial court again distinguished defendant's case from the *Miller* case, however, with respect to the evidence of childhood difficulties, noting that there was no evidence defendant's parents had abused him or used drugs. The trial court agreed with the prosecutor that although an adult codefendant was involved, defendant was "really the leader of this crime spree," a fact that distinguished the instant case from a case involving an "impressionable" juvenile who was following an adult's lead. The trial court also noted that at the time of the crimes, defendant was "only four months away from turning 18."

Defendant's counsel conceded "the heinous nature of the crimes" and, "for purposes of argument," that defendant had been the ringleader. Defendant's counsel argued that the relevant question was whether defendant was "redeemable," and he argued that defendant had indeed shown "that he is capable of rehabilitation."

The trial court asked defendant's counsel to address the evaluations of defendant introduced during his original trial proceedings, one of which described defendant as having a remarkably high degree of sociopathy. The trial court asked defendant's counsel how that description reflected on defendant's ability to rehabilitate. Defendant's trial counsel asserted that "[m]any people age out" of antisocial personality disorder, and noted that the evaluator had not said that defendant had no chance of rehabilitation. Defendant's trial counsel pointed to defendant's good conduct in prison as evidence that defendant was not a sociopath.

The trial court noted that even if it denied defendant's petition, defendant could bring another petition and show further rehabilitation. The court took the matter under submission.

13

### 7. The Trial Court's Ruling

On April 3, 2015, the trial court issued a written ruling denying defendant's petition for recall and resentencing. The trial court noted that it had "considered each of the factors listed in section 1170, subdivision (d)(2)(F)." The court specified its findings as to each factor.

First, "the felony murder and aiding and abetting circumstances do not compel mitigation of [defendant's] sentence." The record indicated that defendant had intended to kill Mathews, and although the jury found true a felony murder special circumstance, the case did not involve an inadvertent killing during a felony. Defendant was also "a fully informed aider and abettor" in the killing of Olivo, since defendant had given Manibusan the gun when Manibusan asked for "his turn" after the shootings defendant had personally committed.

Second, although defendant was on juvenile probation at the time of his crimes, he had no prior "juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims."

Third, although Manibusan was an adult, he "did not appear to influence" defendant, and defendant was "not simply a 'follower.'" Rather, defendant had provided the gun and ammunition to Manibusan, and defendant had committed the initial shootings.

Fourth, "[u]nlike many youthful offenders," defendant had the support of his family prior to and at the time of the crimes, and he had not been abused.

Fifth, the shootings were not attributable to "cognitive limitations due to mental illness or developmental disabilities," although there was evidence that defendant had used methamphetamine and suffered from personality disorders. In the psychiatric evaluations, defendant had been described as a dangerous sociopath, and there was insufficient evidence to indicate that defendant had "overcome these dangerous tendencies."

14

Sixth, defendant had "performed several acts that tend to indicate rehabilitation, or the potential for rehabilitation." He had participated in self-help groups, taken on roles of responsibility in prison, and demonstrated "positive behavior," resulting in a lowered classification level.

Seventh, defendant had maintained a connection with his family, and family friends had been present at the hearing. There was no evidence defendant had contact with anyone involved in crime outside of prison.

Eighth, defendant had no disciplinary history for "violent actions" within the past five years.

The trial court then addressed defendant's argument that cases with LWOP sentences will almost always involve "heinous, atrocious and cruel" crimes. The trial court found that defendant's crimes were "particularly viscous [*sic*], cruel and callous," since Mathews and Aninger were not given a chance to respond to the robbery, there was no attempt to rob Olivo, all three victims were strangers who did nothing to provoke defendant, and all three victims were "caught completely unaware." In addition, defendant was "not a minor or a passive participant" but rather "the leader of the criminal enterprise that day."

### III.    DISCUSSION

Defendant contends the trial court erred in denying his petition for recall and resentencing. He claims the trial court erroneously denied the petition based solely on the circumstances of his crimes and that the relevant factors weighed in favor of recall and resentencing.

#### A.    Case Law

##### 1.    *Miller v. Alabama*

In 2012, the United States Supreme Court ruled that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth

Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2460].)

In *Miller,* the Court explained that its prior cases had "establish[ed] that children are constitutionally different from adults for purposes of sentencing." (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2464]; see *Roper v. Simmons* (2005) 543 U.S. 551 [invalidating death penalty for juvenile offenders]; *Graham v. Florida* (2010) 560 U.S. 48 [LWOP sentences for non-homicide juvenile offenders violate the Eighth Amendment].) Specifically, "juveniles have diminished culpability and greater prospects for reform," making them " 'less deserving of the most severe punishments.' " (*Miller, supra,* at p. __ [132 S.Ct. 2455, 2464].)

The *Miller* court summarized its holding as follows: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2468].)

While *Miller* held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," the court did not decide "that the Eighth Amendment requires a categorical bar on life without parole

16

for juveniles . . . ." (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2469].) However, the court specified it believed that LWOP sentences for juveniles would be "uncommon" and limited to " 'the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]" (*Ibid.*) The court specified that before such a sentence is imposed on a juvenile in a homicide case, the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Ibid.*, fn. omitted.)

### 2. *People v. Gutierrez*

In *Gutierrez, supra,* 58 Cal.4th 1354, the California Supreme Court considered the impact of *Miller* on section 190.5, subdivision (b). The *Gutierrez* court noted that "[f]or two decades, the Courts of Appeal ha[d] uniformly interpreted section 190.5[, subdivision ](b) as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance murder." (*Gutierrez, supra,* at p. 1369.) The California Supreme Court effectively overturned that line of appellate precedent, concluding that "section 190.5[, subdivision ](b), properly construed, confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, *with no presumption* in favor of life without parole." (*Id.* at p. 1360, italics added.) The *Gutierrez* court further held that "consideration of the *Miller* factors" is required when a sentencing court is determining whether to impose an LWOP sentence pursuant to section 190.5, subdivision (b). (*Gutierrez, supra,* at p. 1387.)

In *Gutierrez,* the issue arose on direct appeal, and "[b]ecause the two defendants . . . were sentenced before *Miller* in accordance with the interpretation of section 190.5[, subdivision ](b) prevailing at the time," the court remanded for resentencing. (*Gutierrez, supra,* 58 Cal.4th at p. 1361.)

The *Gutierrez* court rejected the Attorney General's argument that a remand was unnecessary because the "potential mechanism for resentencing" provided by

17

section 1170, subdivision (d)(2) "mean[s] that the initial sentence 'is thus no longer effectively a sentence of life without the possibility of parole.' " (*Gutierrez, supra,* 58 Cal.4th at p. 1386.) The *Gutierrez* court reasoned: "A sentence of life without parole under section 190.5[, subdivision ](b) remains *fully effective* after the enactment of section 1170[, subdivision ](d)(2). That is why section 1170[, subdivision ](d)(2) sets forth a scheme for *recalling* the sentence and *resentencing* the defendant." (*Ibid.*) The *Gutierrez* court further rejected the Attorney General's claim that section 1170, subdivision (d)(2) "removes life without parole sentences for juvenile offenders from the ambit of *Miller*'s concerns because the statute provides a meaningful opportunity for such offenders to obtain release." (*Gutierrez, supra,* at p. 1386.) The court held that what *Miller* required for juvenile offenders sentenced to LWOP was not a " 'meaningful opportunity to obtain release' " but a sentencing court's exercise of discretion " '*at the outset*.' " (*Gutierrez, supra,* at p. 1386.)

### 3. *Montgomery v. Louisiana*

In *Montgomery v. Louisiana* (2016) __ U.S. __ [136 S.Ct. 718] (*Montgomery*), the United States Supreme Court held that *Miller* must be given retroactive application. The petitioner in that case had murdered a deputy sheriff when he was 17 years old. (*Montgomery, supra,* at p. __ [136 S.Ct. 718, 725].) He was convicted of murder and ultimately given an automatic LWOP sentence. (*Id.* at p. __ [136 S.Ct. 718, 725-726].)

After the *Miller* decision, the *Montgomery* petitioner sought collateral review of his mandatory LWOP sentence. (*Montgomery, supra,* __ U.S. at p. __ [136 S.Ct. 718, 726.) The trial court refused to grant relief on the ground that *Miller* was not retroactive on collateral review. (*Montgomery, supra,* at p. __ [136 S.Ct. 718, 727].) The United States Supreme Court reversed, holding that *Miller* had announced "a new substantive rule that, under the Constitution, must be retroactive." (*Montgomery, supra,* at p. __ [136 S.Ct. 718, 732].)

18

The *Montgomery* court addressed the concern that giving *Miller* retroactive effect would "require States to relitigate sentences . . . in every case where a juvenile offender received mandatory life without parole." (*Montgomery, supra,* __ U.S. at p. __ [136 S.Ct. 718, 736].) The court explained: "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. [Citation.] Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." (*Id.* at p. __ [136 S.Ct. 718, 736].)

## B.     *Analysis of the Trial Court's Ruling*

Defendant contends the trial court erroneously denied his petition for recall and resentencing "based solely on the facts of the life crimes." The record does not support this claim. The transcript of the hearing on defendant's petition for recall and resentencing shows that the trial court considered defendant's "rehabilitative efforts" and favorable prison record. The trial court also indicated it had considered whether defendant had childhood difficulties and whether defendant had been influenced by an adult. Additionally, the trial court referenced the fact that defendant had been very close to 18 years old at the time of the offenses. The trial court's written order also reflects that the trial court considered all eight of the factors set forth in section 1170, subdivision (d)(2)(F), and that the trial court found four of the factors applied to defendant.

Defendant also argues that a majority of the factors listed in section 1170, subdivision (d)(2)(F) favored recall and resentencing. In essence, defendant is arguing that the trial court abused its discretion by finding certain factors were not applicable to defendant and in failing to accord appropriate weight to the applicable factors. (See § 1170, subd. (d)(2)(G) [in considering a petition for recall and resentencing, the trial court exercises discretion "in consideration of" the enumerated criteria].) We proceed to

19

review the trial court's findings for abuse of discretion, beginning with the eight factors listed in section 1170, subdivision (d)(2)(F).

The first factor is "[t]he defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law." (§ 1170, subd. (d)(2)(F)(i).) The trial court correctly found that defendant had not been convicted of the Mathews murder based on a felony murder theory. Although a felony-murder special circumstance was found true (see § 190.2, subd. (a)(17)), the underlying murder itself was *not* prosecuted on a felony-murder theory. (See *People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1080 [felony-murder special circumstance is not coextensive with felony-murder theory of first degree murder].) The trial court also found that even though defendant had been convicted of the Olivo murder based on an aiding and abetting theory, defendant was "a fully informed aider and abettor" who had supplied the gun to Manibusan after shooting Mathews and Aninger. The trial court's determination—that this factor did not weigh in favor of recall and resentencing—is consistent with the legislative intent concerning this factor. An analysis of Senate Bill 9, which enacted section 1170, subdivision (d), referenced the fact that many juveniles "were convicted of felony murder or for aiding and abetting because they acted as lookouts or participated in another felony during which the murder unexpected[ly] occurred." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as introduced Dec. 6, 2010 for hearing on Apr. 5, 2011.) As defendant did not act as a lookout or have a similarly minor role in the Olivo murder, but provided the gun and ammunition to the shooter, the trial court's finding was not an abuse of discretion.

The second factor is "[t]he defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall." (§ 1170, subd. (d)(2)(F)(ii).) The trial court essentially found that this factor applied to defendant:

the trial court noted that defendant had been on juvenile probation at the time of the offenses but that he had no juvenile felony adjudications for assault or similar crimes.

The third factor is "[t]he defendant committed the offense with at least one adult codefendant." (§ 1170, subd. (d)(2)(F)(iii).) The trial court found that this fact was technically true, but that it did not weigh in favor of recall and resentencing because the adult (Manibusan) "did not appear to influence" defendant. The trial court noted that defendant was "not simply a 'follower' " but rather the person who provided the gun and ammunition and the person who had committed the initial shootings. The trial court's finding is consistent with the legislative intent behind this factor. The legislative history of Senate Bill 9 shows that the Legislature was concerned about juveniles who were sentenced to LWOP for crimes they committed while " 'acting under the influence of an adult.' " (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 9 (2011-2012 Reg. Sess.) as amended May 27, 2011 for hearing on July 5, 2011, p. 11.) As the record supports the trial court's finding that defendant was not acting under the influence of an adult, the trial court did not abuse its discretion by determining that this factor did not weigh in favor of recall and resentencing.

The fourth factor is "[p]rior to the offense for which the sentence is being considered for recall, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma, or significant stress." (§ 1170, subd. (d)(2)(F)(iv).) Defendant contends that the record is "replete with evidence that from age 11 until he committed the life crimes, [he] was shuttled from home to home, placement to placement, and was suffering from psychological trauma and significant stress." He cites to the 1997 discharge summary from the Heritage Center in Utah as support for his claim. That document reflects that defendant was terminated from two group homes and transferred to the Heritage Center from juvenile hall. The discharge summary also reflects that defendant "described his difficulties as family problems" and described having a "strained relationship" with his mother and her boyfriend. The

21

discharge summary indicates that defendant "had a lengthy history of drug and alcohol use" and that he had been diagnosed with schizoaffective disorder, conduct disorder, and polysubstance dependence. The discharge summary does not, however, show that defendant had "insufficient adult support or supervision" or contain any evidence that defendant "had suffered from psychological or physical trauma, or significant stress." (§ 1170, subd. (d)(2)(F)(iv).) Thus, the trial court did not abuse its discretion by finding that this factor did not apply to defendant.

The fifth factor is "[t]he defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense, but influenced the defendant's involvement in the offense." (§ 1170, subd. (d)(2)(F)(v).) Defendant concedes that this factor "does not apply."

The sixth factor is "[t]he defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse." (§ 1170, subd. (d)(2)(F)(vi).) Defendant references the evidence submitted as to this factor, and the trial court found that this factor applied to defendant.

The seventh factor is "[t]he defendant has maintained family ties or connections with others through letter writing, calls, or visits, or has eliminated contact with individuals outside of prison who are currently involved with crime." (§ 1170, subd. (d)(2)(F)(vii).) The trial court found that this factor applied to defendant.

The eighth factor is "[t]he defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor." (§ 1170, subd. (d)(2)(F)(viii).) The trial court found that this factor applied to defendant.

We have concluded that the trial court did not abuse its discretion by finding that only four of the eight factors listed in section 1170, subdivision (d)(2)(F) applied favorably to defendant. We next proceed to consider whether the trial court abused its discretion by determining that, although four of the enumerated factors applied, those factors did not warrant recall and resentencing when considered in light of other relevant circumstances concerning defendant and his offenses. (See § 1170, subd. (d)(2)(F) [trial court is not limited to consideration of enumerated factors].)

A trial court abuses its sentencing discretion when its decision is arbitrary or capricious, inconsistent with the letter and spirit of the law, or based on "circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) When the sentencing decision involves an assessment of various factors, the trial court has discretion to accord different weight to each factor, and its decision need not be determined by the sheer number of factors on one side or the other. Rather, the trial court's exercise of its sentencing discretion "requires '[a] quantative and *qualitative* analysis' of multiple factors. [Citation.]" (*People v. Wright* (1982) 30 Cal.3d 705, 719.)

Here, the trial court's decision to deny defendant's petition was not based solely on its evaluation of the factors listed in section 1170, subdivision (d)(2)(F) but also on its finding that defendant's crimes were "particularly [vicious], cruel and callous," and that defendant was "the leader of the criminal enterprise that day." Section 1170, subdivision (d)(2)(F) specifies that the trial court is not restricted to a consideration of the enumerated factors, and *Miller* expressly states that "the circumstances of the homicide offense, including the extent of [the defendant's] participation in the conduct" is relevant to the determination of whether to impose an LWOP sentence. (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2468].)

On this record, we find no abuse of discretion in the trial court's determination that the four favorable statutory factors did not outweigh the other relevant factors,

23

including the circumstances of the offense. It was not unreasonable or arbitrary for the trial court to deny the petition for recall and resentencing, despite finding that defendant lacked a violent juvenile record, had made efforts at rehabilitation, maintained family ties, and performed positively while in prison, in light of the other circumstances: defendant's significant role in the crimes and the vicious, cruel, and callous nature of the shootings of three unsuspecting, unarmed women. (See *Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2468] [extent of defendant's participation in the criminal conduct should be considered].)

Last, we consider defendant's argument that, despite the "atrocious nature of his life crimes," three other factors identified in *Miller*—the inherent impact of his age on his culpability, the effect of his family and home environment, and his demonstrated capacity for rehabilitation—weighed in favor of resentencing. While *Miller* did recognize that juveniles are generally immature, impetuous, and unable to appreciate risks and consequences, here defendant was nearly 18 years old at the time of his offenses, so the trial court could reasonably determine that defendant's age did not weigh strongly in favor of resentencing. As to defendant's claim that his family and home environment weighed in favor of resentencing, we have already noted that the record does not show that defendant was physically or emotionally abused or exposed to trauma; there is no evidence that defendant was unable to "extricate himself" from a "brutal or dysfunctional" home. (*Miller, supra,* 567 U.S. at p. __ [132 S.Ct. 2455, 2468].) Having carefully reviewed the record, we conclude the trial court did not abuse its discretion by determining that defendant's age, participation in rehabilitative programs, and demonstrated responsibility in prison did not warrant granting his petition for recall and resentencing.

## IV. DISPOSITION

The order denying the petition for recall and resentencing is affirmed.

24

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____
ELIA, ACTING P.J.




_____
MIHARA, J.







*People v. Willover*
**H042316**

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No.: SM980198 |
| | |
| Trial Judge: | Hon. Carrie M. Panetta |
| | |
| Attorney for Defendant and Appellant:<br>Norman Willover | Michael Evan Beckman |
| | |
| Attorneys for Plaintiff and Respondent:<br>The People | Kamala D. Harris, Attorney General<br>Gerald A. Engler, Chief Assistant Attorney<br>General<br>Jeffrey M. Laurence, Senior Assistant<br>Attorney General<br>Laurence K. Sullivan, Supervising Deputy<br>Attorney General<br>Rene A. Chacon, Supervising Deputy<br>Attorney General |

*People v. Willover*
**H042316**