Filed 3/26/21  P. v. Gauthier CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077277 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE326316) |
| BERTHO PAYTON GAUTHIER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Seth Friedman and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

In September 2014, a San Diego County jury convicted defendant Bertho Payton Gauthier of 11 counts of robbery with gun-use enhancements attached to each count and a discharge of a firearm enhancement attached to three counts.  In October 2014, the trial court sentenced defendant to a total term of 38 years 4 months in prison.  This court in *People v. Gauthier* (Jan. 25, 2016, D066986) [nonpub. opn.] (*Gauthier I*)) affirmed the judgment.

In June 2019, defendant filed a petition for recall of his sentence under Penal Code[1] section 1170.91.  The court at a December 17, 2019 hearing denied the petition, finding defendant was statutorily ineligible for resentencing.  Affirmed.

OVERVIEW

The following summary is taken from *Gauthier I*.

"Defendant committed nine robberies of shops and restaurants in San Diego and Orange Counties between October and December of 2012. Defendant is a five-foot eight-inch tall African–American man who weighs 180 pounds and was 25 years old at the time of his convictions.

"A. The Robbery of the Smoke Shack in San Marcos

"The first robbery occurred at the Smoke Shack, a tobacco store in San Marcos, California.  On October 12, 2012, a robber approached the owner of the Smoke Shack, pointed a gun at him, and demanded money from the cash register.  After the owner handed over the money, the robber took the owner to the store's bathroom and ordered the owner to count to 100.  The robber left while the owner counted.  The owner described the robber as tan skinned, about 5 feet 10 inches tall and 180 pounds with a medium build.  He described the robber's handgun as being medium caliber, potentially a nine-millimeter, and having blue painter's tape wrapped around the barrel.

---

[1]     All further statutory references are to the Penal Code.

2

"The store had a surveillance system that recorded video of the robbery, which was shown to the jury.  The video showed a robber with tan skin (or an African–American with a light complexion) dressed in black shoes, a black or dark blue hoodie-style sweatshirt with the hood pulled up over the back of the head, loose-fitting gray pants and a loose-fitting gray ski mask that covered his whole face except for the area around his eyes, which were visible through a single, large eye hole.  The mask was draped over the front of the robber's neck like a bandana.  As he entered the store, the robber appeared to conceal a handgun in a front pocket of the sweater and revealed the gun as he walked up to the counter.  He held a black bag with his left hand and a gun with his right.  The handgun was a black or dark-colored semiautomatic with what appeared to be blue painter's tape wrapped around the barrel.  The black bag had a white tag.

"A San Diego County Sheriff's deputy reviewed the footage and noticed the robber was not wearing gloves and touched a glass display case with his bare hand.  The deputy dusted the display case for prints and recovered a fingerprint.

"B. The Robbery of the Little Caesar's in San Marcos

"A Little Caesar's in San Marcos was robbed on November 4.  The robber entered the restaurant brandishing a handgun as he approached the counter and demanded money.  An employee emptied out a cash register and placed the money into a bag provided by the robber.  The robber then ordered the employee onto the ground and left the restaurant.  The employee described the robber as an African–American male with a dark complexion and a medium build in his early 30's.  He described the gun as being a black handgun, possibly a nine-millimeter.

"Once again, surveillance cameras recorded video footage of the robbery, which was also shown to the jury. The video footage from the robbery showed an individual quite similar to the robber of the Smoke Shack, except he was now wearing black gloves with a noticeable gray lining where the velcro straps would be located on a typical work glove. The robber carried a black bag for the money, though the bag used in this robbery was shiny and appeared to be a plastic shopping bag. The robber once again wielded a black or dark-colored semiautomatic handgun, though this time there was no blue tape visible on the barrel. He entered the store already holding the gun in his right hand and the bag in his left. The robber often held the gun sideways when aiming it at the employee.

"C. The Robbery of the Inner Limits Store in San Clemente

"On November 6, the Inner Limits store in San Clemente, California was robbed. The robber confronted two employees working near the registers, demanding they give him money while pointing a black handgun at them. The employees were shocked and not certain whether they were really being robbed or someone was playing a joke on them. They did not immediately comply, and the robber fired a shot into a display. The employees then emptied the two cash registers into a bag provided by the robber. The robber told the employees to 'kiss the ground,' and they crouched down on the floor as the robber left the store. After the robber left, the employees called the police.

"Deputies from the Orange County Sheriff's Department responded to the call. A deputy surveyed the crime scene and noticed copper jacketing from the spent bullet near the glass case the robber shot. A '40 S & W federal casing' and two bullet fragments were recovered at the crime scene.

4

"Once again, the robbery was captured on a surveillance camera, and the video was shown to the jury. The video footage showed a robber with a build and skin tone similar to the robber of the Smoke Shack and the Little Caesar's in San Marcos. Like the previous two robberies, the robber wore black shoes, a loose-fitting gray ski mask and gray pants that were seemingly the same as those worn by the robber of the San Marcos stores. As in the San Marcos Little Caesar's robbery, the robber here appeared to be wearing black gloves with a gray lining along the velcro strap. The hooded sweatshirt worn by the robber was different this time as it was red instead of black or dark blue. The robber also used a black bag that appeared to have a white tag on it. The gun appeared to be hidden under the bag and was not visible in the video; however, the robber once again held the bag with his left hand as he entered the store.

"D. The Robbery of the Happiness Nails Salon in Vista

"The Happiness Nails salon in Vista, California was robbed on November 21. The robber entered the salon and announced his intent to rob the store. Nobody moved, and the robber responded by firing a shot into the ceiling from a handgun. The robber then pointed the gun at a worker behind the cash register and demanded money. The worker gave the robber all the money in the register, which the robber put into a black bag. After receiving the money, the robber ordered everybody to the back of the salon and left.

"One witness described the robber as being a five-foot five-inch tall African–American male, though other witnesses described the robber as being 5 feet 8 to 5 feet 9 inches tall. A few days after the robbery, a nephew of one of the salon's employees discovered a bullet while repairing the salon's air conditioning. The bullet was provided to the San Diego County Sheriff's Department.

5

"As in the other robberies, surveillance cameras inside the salon captured footage of the robbery, and the footage was shown to the jury. The physical features of the robber were similar to the features of the robber at the San Marcos and Orange County robberies. The robber wore loose-fitting gray pants and a gray ski mask. Unlike the previous robberies, this time the robber did not wear a hooded sweatshirt but instead wore what appeared to be a hoodless gray sweatshirt. The robber again wore black gloves with a gray lining along the velcro straps. The black bag appeared to have a white tag. Once again the robber held the black bag with his left hand and the gun with his right. He appeared to conceal the gun under the black bag as he entered the store, before quickly revealing it. The robber also appeared to be holding a white-colored bag around his gun for shell casings. The surveillance footage shown to the jury was recorded by playing the original footage on a monitor and recording that footage with a camera, resulting in a relatively low quality video recording. A San Diego County Sheriff's deputy who watched the original footage described the bag the robber used to collect shells as a shopping bag.

"E. The Robbery of Roberto's Taco Shop in San Diego

"Roberto's Taco Shop in San Diego, California was robbed on December 1. The robber approached the counter, where the store owner, Fermin Martinez, was working. The robber pointed a gun at Martinez and demanded money. Another worker, Jorge Rodriguez was present and gave a short account that is largely similar to Martinez's testimony.

"Martinez initially suspected he was the victim of a prank being played by a customer who had just left the restaurant. In response to the robber's demands, Martinez told him to 'Take the money yourself.' The robber chambered a round in the gun and asked Martinez, 'do you think I'm joking?'

At that point, Martinez realized he was actually being robbed. He opened the cash register and told the robber to take the money. The robber replied, 'No[, y]ou do that' and held out a drawstring bag in one hand while pointing the gun at Martinez with the other. Martinez asked the robber if he wanted just the paper dollar bills or the coins as well. The robber responded by asking Martinez if he thought he was playing around. The robber then pointed his gun downward and fired one shot. Either before or after the robber fired the shot, Martinez took all of the paper money out of the cash register and placed it inside the robber's bag. Martinez gave the robber all of his paper currency, but none of the coins. After firing the shot, the robber told Martinez and Rodriguez to get on the ground and then left the restaurant.

"A San Diego police officer responded to the robbery call and recovered a fired cartridge case from the floor of the restaurant and a bullet from inside one of the restaurant's walls. The shell casing was from a 'Smith and Wesson 40,' and the cartridge was marked 'S & W Federal.' There was no surveillance footage of the robbery at Roberto's Taco Shop.

"F. The Robbery of the Little Caesar's in Rancho Bernardo

"Another Little Caesar's in the northern San Diego County community of Rancho Bernardo was robbed on December 10. Video surveillance footage showed the robber standing and pacing around in the restaurant for about 45 seconds before an employee came out of the back of the restaurant into view of the robber. The robber approached a counter, pointed a gun at the employee and demanded money from the cash register, threatening to shoot the employee if he did not hurry. The robber left immediately after being handed the money without issuing any further instructions to the employee. The employee saw a white Mitsubishi Eclipse with a spoiler quickly leave the parking lot shortly after the robbery, leading him to believe the car may have

belonged to the robber. The employee described the robber as being a six-foot four-inch tall African–American man with light complexion and medium build. The employee was unable to conclusively identify defendant as the robber at trial, but simply stated: 'He looks familiar.' On cross-examination, the employee admitted he was unable to identify a photograph of the defendant as the robber in a photographic lineup.

"The robbery was recorded by surveillance cameras and, like the other videos, the recording of the robbery was played for the jury. The video showed a robber with the same build and skin tone as in the earlier robberies. The robber appeared to be wearing the same gray ski mask and gloves as before. In the tape, the robber entered the store holding a dark-colored semiautomatic handgun in his right hand and a black bag with a white tag in his left, initially using the bag to conceal the gun from view. The robber often held the gun sideways while aiming at the employee. The video clearly showed the robber using a white-colored translucent bag similar to a hairnet to collect any shells discharged by his handgun.

"G. Defendant's Arrest and Trial

"Three San Diego area liquor stores were robbed on December 21. Unlike the previous robberies, the robber did not wear a ski mask but instead drew a fake beard on his face using makeup. A La Mesa police officer arrested defendant approximately three hours after the final robbery. The officer found a handgun in the passenger seat of defendant's rental car. The gun was a 'Springfield Armory SC–40' loaded with a 40–caliber federal bullet in the chamber. One police officer described the gun as being painted in an olive green color and having blue tape on the barrel. Descriptions of the gun given by both the prosecution and the defense during closing arguments

8

indicate that the gun recovered was a multicolored semiautomatic handgun that was dark colored on the top and green around the handle.

"A search of defendant's car revealed goods and money likely stolen from stores earlier in the day and other evidence. Items found in defendant's car that are of relevance to this appeal include: a white hairnet similar to that used in the Rancho Bernardo Little Caesar's robbery to collect shell casings, a plain black hooded sweatshirt similar to that worn in the robberies of the Smoke Shack and the two Little Caesar's, a black drawstring bag with a large golden Michael Jordan jump man logo on the sides that had been turned inside out so the bag appeared plain black, and a pair of black work gloves with a gray pattern lining the velcro.

"A fingerprint expert with the San Diego County Sheriff's Department testified at trial that defendant's fingerprints matched a latent fingerprint collected at the Smoke Shack in San Marcos. A firearms expert with the San Diego County Sheriff's Department testified that ballistics evidence matched the firearm found in defendant's car to the gun used in the robberies of the Inner Limits store in San Clemente, the Happiness Nails salon in Vista, and Roberto's Taco Shop in San Diego.

"An investigator with the San Diego County Sheriff's Department in charge of investigating the robbery of the Little Caesar's in San Marcos opined that based upon comparisons of surveillance video, he believed the robber in the San Marcos Little Caesar's robbery was the same person who robbed the Smoke Shack in San Marcos and the Little Caesar's in Rancho Bernardo.

"At trial, defendant's attorney conceded that defendant committed the final robbery but argued that evidence tying defendant to the other robberies was insufficient, particularly the robberies where the only evidence to tie

9

defendant to the robbery was eye witness descriptions, items found in defendant's car that resembled items worn or used by the robber, and video footage." (*Gauthier I*, at pp. 1–6, fn. omitted.)

DISCUSSION

Defendant contends the court abused its discretion in denying his petition for resentencing under section 1170.91 because it failed to consider his alleged service-related mental health and substance abuse problems as mitigating factors at his 2014 sentencing.

A. *Guiding Principles*

Enacted in 2014, former section 1170.91 created a mechanism for courts to consider mental health and substance abuse problems stemming from military service as a mitigating factor when imposing a determinate term under section 1170, subdivision (b). (See Stats. 2014, ch. 163 (Assem. Bill No. 2098), § 2, eff. Jan. 1, 2015.) Effective January 1, 2019, Assembly Bill No. 865 (2017–2018 Reg. Sess.) amended section 1170.91 to extend its application to a person "currently serving a sentence for a felony conviction."

Pertinent to this appeal, subdivision (b)(1) of section 1170.91 provides: "A person currently serving a sentence for a felony conviction, whether by trial or plea, who is, or was, a member of the United States military and who may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder [(PTSD)], substance abuse, or mental health problems as a result of his or her military service may petition for a recall of sentence, before the trial court that entered the judgment of conviction in his or her case, to request resentencing pursuant to subdivision (a) if the person meets both of the following conditions: [¶] (A) The circumstance of suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of the person's

10

military service *was not considered as a factor in mitigation at the time of sentencing.* [¶] (B) The person was sentenced prior to January 1, 2015. This subdivision shall apply retroactively, whether or not the case was final as of January 1, 2015." (Italics added.)

B. *2014 Sentencing*

Defendant on October 28, 2014, submitted a statement in mitigation (hereinafter, 2014 statement) in connection with his sentencing. In the 2014 statement, defendant requested the court impose a 25-year prison term on count 3, the principle term, and run the remaining counts concurrent. In support of his request, defendant argued the circumstances in mitigation included his lack of a criminal record prior to the offenses and his service to "our country as [a] Marine." The 2014 statement continued: "And unfortunately when he ended his service with the Corp., like many other servicemen, he found it difficult to obtain satisfactory employment. . . . [¶] Because of the difficult financial situation combined with the pride of being a Marine who is capable of taking care of the problems by himself he made a fateful decision. He decided to commit robbery." The statement concluded the court should impose the 25-year sentence "[b]ecause of Mr. Gauthier's lack of record, prior service to our country and strong support from family and friends."

The 2014 statement included several attachments. As relevant here, attachment A included a series of documents depicting defendant's military service, including a picture of him in military uniform[2]; multiple certificates from the Marine Corps showing defendant had successfully completed various service-related programs and courses; and a letter from his

---

[2]    The copy of the picture is dark, but under the picture there is a caption that reads "CPL B. P. Gauthier" and it clearly shows a man in dress uniform.

11

commanding officer recommending with "enthusiasm" defendant's request for active duty in the active reserve program.

Attachment B to the 2014 statement included several letters in support of defendant. One letter was written by Marcus A., a fellow Marine who was deployed with defendant and who described him as a "great leader." Another letter was written by former coworker Russel L., who met defendant in 2009 while defendant was serving in the Marine Corps and who, like Marcus, described defendant as an outstanding individual. Russel stated he had served eight years in the United States Navy and was a Navy combat veteran, and defendant had helped him transition from military to civilian life. Defendant's cousin, Darline T., wrote a letter to the judge describing how proud she was of defendant after he "enlisted in the Marines right out of high school to serve his country."

The October 29, 2014 probation report noted defendant entered the U.S. Marine Corps in 2007 and in 2012 received an "Other than Honorable Discharge" for what defendant had explained was possession of the drug "Spice." Under the category of "Psychological and Medical Problems," the probation report noted, "He reported he was diagnosed as having PTSD and alcohol dependency in 2013. He said he was also diagnosed with Schizophrenia while in custody last year. He said he was prescribed [various prescription drugs and] he feels better now and is only taking [one such drug] for depression and sleep."

Under the category of "Substance Abuse and Treatment History," the probation report in part noted, "He began smoking marijuana at age 14. He said he smoked marijuana regularly but not daily. He began drinking alcohol regularly at age 18, and he was drinking up to a fifth of hard liquor daily by

age 20. He said he also began to smoke up to 14 grams of spice daily at age 20."

The probation report recommended defendant be sentenced to the term of 78 years 4 months, with credit for time served. In support of its recommendation, probation recognized that defendant had used a handgun to commit nine armed robberies; that he planned these robberies as evidenced by his use of various disguises; that during the commission of four of the robberies, he fired his handgun into walls and/or the ceiling to intimidate his victims; that the victims as a result suffered emotional distress; that it was "fortunate . . . no one was killed or seriously hurt," given the number of armed robberies"; and that defendant "presents an extreme danger to the community and it is appropriate that he should serve the majority of his life in state prison."

At the commencement of the sentencing hearing, the court noted it had reviewed the "presentence report; two sets of documents filed on behalf of Mr. Gauthier; the sentence statement in mitigation, as well as a series of additional letters," all of which would comprise defendant's "prison pack."

At sentencing, defense counsel recognized defendant's case was "difficult" because the crimes he committed were "very serious," there were "multitudes of them," and he had used a gun. Defense counsel nonetheless asked the court to follow the recommendation in the 2014 statement and impose a 25-year term because defendant had no prior criminal record and because he was a "productive member of society," adding, "He was a member of the Marine Corps, six years, I think quite successfully in the Marine Corps prior to committing these offenses." Defense counsel also noted the many letters written in support of defendant, including "from former Marines."

13

Thus, counsel asked the court not to impose the high term, as recommended by probation.

After hearing additional argument, the court sentenced defendant to 38 years 4 months. The court took three instances involving the discharge of the weapon, and sentenced defendant on those counts "with the remainder of the counts running concurrent." It explained: "As to Count 3, which I used as the principal term, I gave him a mid term of three on the robbery. The 12022.5(a), a mid term of four, and that was stayed under 12022.53[]F. The 10 years under 12022.53(b) likewise was stayed pursuant to 12022.53F. And the 12022.53(c) plus 20 was imposed, so the total term of imprisonment arising from Count 3 was 23 years.

"Count 4, he received one-third the mid term, which is one year. The 12022.5(a) and 53 likewise were stayed pursuant to 12022.53F. One-third the term of 20 years under 12022.53(c) is an additional six eight.

"Count 6 was one-third the mid term, an additional year. In count 6 the 12022.5(a), the 12022.53(b), a mid term of four on the A, 10 years on the B. Those are stayed . . . . The 12022.53(c) is imposed, one-third the 20-year enhancement is another six eight.

"So in Count 3 he gets 23, Count 4 he gets a total of seven eight, and Count 6 a total of seven eight. I came up with 38 years four months for those three counts." As noted, all other sentences on the remaining counts were run concurrently.

C. *2019 Hearing on Resentencing Petition*

The record shows the same trial judge that sentenced defendant in October 2014 also heard defendant's section 1170.91 petition. In support of his petition, defendant on November 19, 2019, submitted a statement in mitigation (hereinafter, 2019 statement).

14

In his 2019 statement, defendant argued that during his sentencing, "evidence of his drug use and the post-traumatic stress he suffered from as a result of his military service was not brought to the court's attention, and as a result, was not considered as a mitigating factor during his probation, hearing, and sentencing." He noted that the October 2014 probation report did not list substance abuse or PTSD as mitigating factors, but only his lack of a prior criminal history. Therefore, defendant further argued that he met the eligibility requirements for resentencing under section 1170.91; that his substance abuse and PTSD resulted from his military service; and that the court should consider these mitigating factors and sentence him to lesser term.

Attachments to his 2019 statement included a March 24, 2015 mental health treatment plan prepared by the Department of Corrections describing defendant's history of drug abuse and diagnosing him with poly-substance abuse, and with PTSD "in [f]ull [r]emission."

The People on November 19, 2019, filed an opposition to the petition. The People argued defendant was statutorily ineligible for relief under section 1170.91 because his substance abuse and PTSD resulting from his military service had been considered when the court in 2014 imposed a mid-term sentence on counts 3, 4, and 6, and not the upper term as recommended by probation. The People also argued the petition should be denied because there was no nexus between the mitigating factors in section 1170.91 and the armed robberies defendant committed, and because there was no evidence defendant suffered any such mitigating factors as a result of his military service.

At the December 17, 2019 hearing on the petition, defense counsel— who was also counsel of record at defendant's 2014 sentencing—argued

defendant was entitled to relief under section 1170.91 because he suffered both PTSD and from substance abuse as a result of his military service, with the latter leading to his discharge from the military. Defense counsel conceded the court was aware of these mitigating factors at defendant's sentencing, noting there was a "couple brief mentions of PTSD" and "also a brief mention of the drug and alcohol abuse."

However, defense counsel argued he had "glossed over" the fact defendant had a drug and alcohol problem, and instead had focused on defendant's "financial affairs" as the reason for defendant's commission of the offenses. Counsel further argued defendant "did suffer some abuse while in the military." Counsel noted this abuse may not have risen to the "level of PTSD," but defendant nonetheless faced "racism" and "cross-cultural issues" during his military service that led to his substance abuse, which made defendant eligible for resentencing under section 1170.91.

The People argued defendant was ineligible for relief under section 1170.91 because the "duty-related mental health illness alleging PTSD was before the Court at the time of sentencing." The People further argued that defendant received "roughly half" of the sentence he could have received given the number and seriousness of the offenses.

The court denied defendant's petition, finding him ineligible for resentencing under section 1170.91. The court found the issues in defendant's petition were "well known to the Court at the time of sentencing." The court explained, "At the time I sentenced Mr. Gauthier I thought that I had fashioned a sentence that reflected his participation in these crimes, the extreme amount of danger that he created as a result of this armed robbery series. I was *well aware* that there was a history of substance abuse, I was *well aware* there was a claim of PTSD, but, as I indicated, that was not the

16

driving factor behind those crimes, and it played little, if any, part in why these crimes were committed."  (Italics added.)

D.  *Analysis*

As noted, the same trial judge that sentenced defendant in 2014 decided defendant's petition for resentencing in 2019.  In denying the petition, the trial judge expressly stated he had been "well aware" of defendant's claims of PTSD and substance abuse when the court imposed the midterm, and not the upper term as probation had recommended.

The record contains ample evidence to support this finding.

As summarized *ante*, the record shows defendant in his 2014 statement requested the court impose a 25-year-prison term because defendant had no prior criminal history *and* because of his military service in the Marines Corps, which had ended abruptly because of drug use.  The record also shows defendant's military service was front and center at the sentencing, as the 2014 statement included a copy of a picture of defendant in military dress, multiple certificates from the Marine Corps showing defendant had successfully completed various service-related programs and courses; and a letter from his commanding officer recommending with "enthusiasm" defendant's request to participate in the active duty reserve program.

In addition, the 2014 statement also included support letters from individuals defendant had served with, and from relatives who praised defendant for his decision to join the Marine Corps out of high school.

The record also shows defendant was facing a possible sentence of 78 years 4 months, but received "roughly half" of that sentence because the court considered the circumstances in mitigation, as the trial judge himself noted in denying the petition, when he imposed the midterm on counts 3, 4, and 6, and ran the sentences on all other counts concurrent.

Based on this record, we conclude substantial evidence supports the court's finding under subdivision (b)(1) of section 1170.91 that the circumstance of defendant suffering from PTSD and substance abuse as a result of his military service was in fact considered by the trial judge at defendant's 2014 sentencing. As such, we conclude the court properly denied defendant's resentencing petition.

Defendant nonetheless argues the court erred because it concluded that a service-related mental health condition could only serve as a mitigating factor if it caused defendant to commit the charged crimes and because the court allegedly did not determine whether his PTSD and substance abuse issues were service-related. Even assuming this was error, we find no resulting prejudice as the record shows the court considered defendant's PTSD and substance abuse as mitigating factors when it originally sentenced him in 2014. (See *People v. Willover* (2016) 248 Cal.App.4th 302, 323 [noting that when a "sentencing decision involves an assessment of various factors, the trial court has discretion to accord different weight to each factor, and its decision need not be determined by the sheer number of factors on one side or the other," and that instead, "the trial court's exercise of its sentencing discretion 'requires "[a] quantitative and *qualitative* analysis" of multiple factors' "], quoting *People v. Wright* (1982) 30 Cal.3d 705, 719.)

In addition, the record clearly shows that even if the court had found defendant eligible for resentencing under section 1170.91, it would not have exercised its discretion to impose a lesser sentence. (See, e.g., *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [concluding remand is unnecessary if the "record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement"]; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896

18

[resentencing was required "unless the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion to strike the allegations"].)

As summarized *ante*, in imposing the middle term the trial judge considered the "extreme amount of danger" defendant caused in committing the series of armed robberies, considered the circumstances in mitigation, and sentenced defendant to "roughly half" of the potential prison term he was facing. The record thus clearly shows that even if the court had found defendant eligible for resentencing under section 1170.91, it would not have further reduced his sentence.

## DISPOSITION

The order denying defendant's section 1170.91 petition is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

19