Filed 4/2/24  P. v. Harring CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID LEE HARRING, JR.,<br><br>    Defendant and Appellant. | F086023<br><br>(Super. Ct. No. SC073336A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

This is petitioner David Lee Harring, Jr.'s second appeal from his 2018 petition for recall and resentencing under Penal Code section 1170, subdivision (d). In a partially published opinion, we vacated the trial court's denial of Harring's petition and remanded for a resentencing hearing. (*People v. Harring* (2021) 69 Cal.App.5th 483, 503 (*Harring I*).) Upon resentencing, the trial court reimposed a term of life without the possibility of parole (LWOP) for a murder Harring committed in 1997 when he was 17 years old.

On appeal, Harring challenges that resentencing determination and additionally seeks a new juvenile transfer hearing in light of ameliorative changes in the law since his original transfer hearing conducted in 1997. We conclude Harring has not established the sentencing court abused its discretion in reimposing a term of LWOP. Nonetheless, Harring is entitled to remand for a new juvenile transfer hearing in view of the amendments to Welfare and Institutions Code[1] section 707 under Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016) (Proposition 57)), Assembly Bill No. 2361, and Senate Bill No. 545; and the amendment to section 607 under Senate Bill No. 135.[2] Accordingly, we conditionally reverse Harring's sentence and remand for a transfer/amenability hearing before the juvenile court.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless indicated otherwise.

[2]     Assembly Bill No. 2361 (2021–2022 Reg. Sess.) (Assembly Bill 2361), effective January 1, 2023; Senate Bill No. 545 (2023–2024 Reg. Sess.) (Senate Bill 545), effective January 1, 2024; Senate Bill No. 135 (2023–2024 Reg. Sess.) (Senate Bill 135), effective September 13, 2023.

# FACTUAL BACKGROUND

## I.     November 1997 Murder and Procedural History

In November 1997, when Harring was 17 years old, he and three other youths[3] approached brothers Arnulfo S. and Arturo S., who were walking home from an English language class they had just completed. During an attempted robbery of the brothers, Harring shot them both. Arnulfo was fatally shot in the head and the neck. Arturo was shot in the arm, which passed into his chest, but he survived. (*Harring I, supra,* 69 Cal.App.5th at p. 490.)

The People charged Harring with (1) first degree willful, deliberate and premeditated murder (Pen. Code, § 187, subd. (a)) of Arnulfo with a special circumstance allegation that the murder was committed during the commission of a robbery (*id.,* § 190.2, subd. (a)(17)), and an enhancement allegation for personal use of a firearm under Penal Code section 12022.5, subdivision (a); (2) attempted first degree premeditated murder (*id.,* §§ 664, 187, subd. (a)) of Arturo with enhancement allegations for the personal use of a firearm under Penal Code section 12022.5, subdivision (a), and inflicting great bodily injury (GBI) under Penal Code section 12022.7; (3) attempted robbery (*id.,* §§ 664, 212.5, subd. (c)) of Arnulfo with an enhancement allegation of personal use of a firearm under Penal Code section 12022.5; and (4) attempted robbery (*id.,* §§ 664, 212.5, subd. (c)) of Arturo with enhancement allegations for the personal use of a firearm under Penal Code section 12022.5, subdivision (a), and for inflicting GBI under Penal Code section 12022.7.

On June 9, 1998, a jury convicted Harring of each offense and found true all enhancement allegations. The court sentenced Harring on July 30, 1998, to LWOP on count 1, plus an additional 10-year determinate term for the firearm enhancement. The

---

[3]     Harring indicated in his sentencing brief filed in September 2022 that the others with him were also juveniles.

trial court imposed a term of life with the possibility of parole on count 2, plus an additional 10-year determinate term for the firearm enhancement and a three-year additional term for the GBI enhancement on this count to be served consecutive to count 1. Harring was also sentenced to a term of three years each on counts 3 and 4, which were stayed pursuant to Penal Code section 654, as were the terms imposed for the enhancements found true as to counts 3 and 4.

## II.     Petition For Resentencing and Recall (Pen. Code, § 1170, Subd. (d))

On December 19, 2018, approximately 20 years after beginning to serve his sentence, Harring filed a petition with the Kern Superior Court for recall and resentencing pursuant to Penal Code section 1170, former subdivision (d)(2). A hearing was held on March 13, 2019, where Harring's mother and Harring testified.

Sharon Kelley testified Harring's father was killed in a robbery when Harring was five years old. She remarried when Harring was seven years old, but her new husband was in and out of jail. Kelley raised her five children on her own for the most part, and worked more than 40 hours a week out of the house. As the oldest sibling, Harring would care for his younger siblings when she was gone. When Harring was in high school, they moved to an area that had "a lot of crime and drug traffic." Harring had done well in high school to that point; he kept his grades up, had no disciplinary issues except one she recalled on cross-examination, and participated on multiple sports teams. After the family moved, Harring was ineligible to participate in high school sports and he became angry and closed off; he began hanging around with relatives who were "bad actors." Disciplinary issues arose at school, and he was arrested in March 1997 for a shoplifting incident in a department store, which Kelley acknowledged on cross-examination involved a physical altercation with store personnel. Kelley testified Harring had been the target of a shooting in the past, but he had not actually been hit with a bullet; some of his cousins with whom Harring spent time were gang members.

4.

When Harring committed the robbery and murder in November 1997, he was with some of his cousins of whom Kelley did not approve. Since Harring has been incarcerated, Kelley testified he has demonstrated remorse and had changed a lot. He participated in the Defy program which he completed in 2018 and now resolves conflict in a different manner. Kelley testified that if Harring was released from prison, he would have family support and a place to stay. She acknowledged on cross-examination that Harring had acquired numerous disciplinary violations while in prison, including for fighting, drugs, and having a cell phone.

Harring testified his father died when he was about five years old; his mother remarried, but his stepfather was periodically in and out of prison and they never formed a particularly close relationship. In high school, Harring had to switch high schools and became ineligible to play high school sports due to school district boundaries; the neighborhood had negative influences, including extended family who were gang members. After someone had fired a gun at him, Harring started carrying a gun. In March 1997, he was caught shoplifting, and he was sentenced to community service, which he did not complete.

Later in 1997, Harring was arrested with some of his cousins for murder. Harring stated one of the cousins claimed the victims owed him money, and when the victims fought back, Harring and the others came to the cousin's assistance. Harring said his mind "went red" and he started shooting in the belief he was defending his cousin and himself.

When Harring was sent to prison at 18 years old, he "felt like a zombie." It was stressful, and he was angry. In 2004, he obtained a GED certificate. He did not immediately enroll in college courses because those required books and materials for which he did not have the money. He was not afforded much opportunity to participate in rehabilitative programs because he had a life sentence, and priority was given to those with release dates. The program offerings started to get better when new laws were

passed for juvenile offenders. He explained the basis for certain prison violations for battery and fighting he had acquired in 2000, 2008, 2011 and 2015, and detailed different programs in which he had participated that had helped him mature, develop more communication skills, and make better choices to avoid fighting and conflict. He noted the support he would have upon release, including housing and job opportunities, and explained he had gotten married in 2018. He expressed remorse and regret for the murder he had committed.

On March 27, 2019, the court denied the petition, finding Harring ineligible for resentencing. On appeal, we reversed the trial court's eligibility determination, vacated the sentence, and remanded for the trial court to resentence defendant under Penal Code section 1170, subdivision (d). (*Harring I, supra*, 69 Cal.App.5th at pp. 503, 504.) Upon remand before the trial court, Harring submitted an updated sentencing brief; the People filed a reply brief; the parties presented argument at a hearing on March 7, 2023; the trial court agreed to consider the 2019 hearing testimony of Kelley and Harring; and the trial court took the matter under submission. At a subsequent March 21, 2023, hearing, the trial court again sentenced Harring to a term of LWOP for the murder conviction on count 1. The aggregate sentence was 11 years determinate (enhancements on counts 1 & 2), plus LWOP (count 1), plus life with the possibility of parole (count 2). The terms imposed for counts 3 and 4 (attempted robbery) were stayed under Penal Code section 654, as were the sentences on the attached enhancements.

## DISCUSSION

## I.     Remand is Required For Juvenile Transfer/Amenability Hearing

Harring argues the recall of his sentence (Pen. Code, § 1170, subd. (d)(2)) rendered the judgment nonfinal, Proposition 57 and subsequent ameliorative changes in the law relevant to juveniles apply retroactively, and his case must be returned to the juvenile court for a new juvenile transfer hearing under section 707. (*People v. Padilla* (2022) 13 Cal.5th 152, 166–167.) The People argue this claim has been forfeited because

6.

Harring failed to request a juvenile transfer hearing in March 2023 when the resentencing occurred, but they otherwise agree that if the claim is not forfeited, the changes in the law apply retroactively and Harring is entitled to a new juvenile transfer/amenability hearing.[4]

### A. Harring's Judgment is Nonfinal

The parties agree, and we concur, that when Harring's sentence was recalled in 2021 (Pen. Code, § 1170, subd. (d)(2)) and remanded to the trial court for resentencing (Pen. Code, § 1170, subd. (d)(6) (Penal Code section 1170(d)(6)), the judgment in Harring's case was rendered nonfinal. (*People v. Padilla, supra*, 13 Cal.5th at pp. 161–162 [sentence vacated during habeas corpus proceedings rendered judgment nonfinal]; see *People v. Montes* (2021) 70 Cal.App.5th 35, 47–48 [recall and resentencing under Pen. Code, § 1170, subd. (d), rendered judgment nonfinal, entitling adult defendant to retroactive application of Prop. 57 and a new juvenile court transfer hearing]; *People v. Lopez* (2020) 56 Cal.App.5th 835, 845 [resentencing under Pen. Code, § 1170, former subd. (d)(1), "replaces the original sentence" such that the "finality of the original sentence is no longer material"].) As such, Harring is entitled to retroactive application of ameliorative changes in the law.

### B. Changes in the Law Since 1997

#### 1. Changes Enacted Before March 2023 Resentencing Hearings

##### a. Proposition 57

When Harring committed the crimes in 1997, "'a child could be tried in criminal court only after a judicial determination … that he or she was unfit to be dealt with under juvenile court law.'" (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 305 (*Lara*).)

---

[4] The parties were offered an opportunity to address the issues of retroactivity and remedy as to Senate Bill 545 and Senate Bill 135, which were enacted while this appeal was pending, and both parties filed supplemental briefs. The parties agree the changes in the law under Proposition 57, Assembly Bill 2361, Senate Bill 545, and Senate Bill 135 all apply retroactively to nonfinal judgments such as Harring's.

A juvenile was "presumed to be not a fit and proper subject to be dealt with under the juvenile court law unless the juvenile court conclude[d] … the minor would be amenable to the care, treatment, and training program available through the facilities of the juvenile court based upon an evaluation of" specifically enumerated criteria. (§ 707, former subd. (c); Stats. 1997, ch. 910, § 2.)

With the passage of Proposition No. 21[5] in 2000, prosecutors were required to charge minors 14 years old or older directly in criminal court for specified murders and sex crimes. (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88 (*O.G.*), citing § 602, former subd. (b), repealed by Prop. 57, § 4.1.) For other identified serious offenses, Proposition 21 provided prosecutors with discretion to charge minors 14 years of age or older directly in criminal court instead of juvenile court. (*O.G., supra*, at p. 88, citing § 707, former subd. (d), repealed by Prop. 57, § 4.2.)

"In the years after the passage of Proposition 21, there was 'a sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders, as reflected in several judicial opinions.' [Citation.] These changes were based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences. [Citations.] In the same period, the California Legislature enacted numerous reforms reflecting a rethinking of punishment for minors." (*O.G., supra*, 11 Cal.5th at p. 88.)

Consistent with this trend, in November 2016, California voters passed Proposition 57, changing the procedure for charging juveniles. (*Lara, supra*, 4 Cal. 5th at p. 303.) "'Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing by prosecutors. Certain categories of minors …

---

[5] Proposition No. 21, titled the Gang Violence and Juvenile Crime Prevention Act of 1998, approved by voters at the March 7, 2000, Primary Election (Proposition 21).

[could] still be tried in criminal court, but only after a juvenile court judge conduct[ed] a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated.'" (*Id.* at p. 305.) Proposition 57 did away with the presumption the juvenile was unfit to be dealt with in juvenile court, and provided that the People had the burden to show that the juvenile should be treated as an adult. (*People v. Padilla, supra,* 13 Cal.5th at pp. 166–167.)

### b. Assembly Bill 2361

Effective January 1, 2023, the Legislature amended section 707, adding the following language: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); Stats. 2022, ch. 330, § 1). This amendment changes section 707 in several respects. First, it increases the burden of proof borne by the prosecution from preponderance of the evidence to clear and convincing evidence (§ 707, subd. (a)(3)), an "intermediate standard [that] 'requires a finding of high probability'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998). "'Where clear and convincing proof is required, the proponent must convince the jury or judge, as the case may be, that it is *highly probable* that the facts which he asserts are true. He must do more than show that the facts are probably true.'" (*Id.* at pp. 998–999.)

Second, this amendment to section 707, subdivision (a)(3), makes amenability to rehabilitation *the* dispositive question rather than one of merely five factors to consider. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416 (*E.P.*); accord; *In re S.S.* (2023) 89 Cal.App.5th 1277, 1284 (*S.S.*).)

Third, "the previous version [of the statute] required that if the juvenile court orders a transfer, it shall recite the basis for its decision in the order." (*E.P., supra,* 89 Cal.App.5th at p. 416.) As amended, section 707, subdivision (a)(3), requires more of the

court:  "If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court….*"  (Italics added.)

### 2.  Changes After the 2023 Resentencing Hearing

#### a.  Senate Bill 545

In addition to these changes, Senate Bill 545 amended section 707 effective January 1, 2024.  Prior to the passage of Senate Bill 545, to transfer an individual to criminal court, the juvenile court was required to find by clear and convincing evidence that the individual is not amenable to rehabilitation when under the jurisdiction of the juvenile court after consideration of specified criteria.  In evaluating these specifically identified criteria, the prior law allowed the juvenile court to give weight to *any* relevant factor.  (Legis. Counsel's Dig., Sen. Bill No. 545 (2023–2024 Reg. Sess.).)

Under the new law, the juvenile court is *required* to give weight to any factor relevant to the specifically identified criteria for making the amenability determination. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii) & (E)(ii).)  The new law also specifies additional factors the juvenile court must consider when evaluating the minor's criminal sophistication, including the effect of the minor's community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery (*id.*, subd. (a)(3)(A)(ii)).  Finally, the law now requires the court to give weight to evidence that indicates the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor.  (*Id.*, subd. (a)(3)(E)(ii)).

#### b.  Senate Bill 135

Senate Bill 135 amended section 607, subdivision (d), effective September 13, 2023.  Under the prior version of the law, a juvenile court retained jurisdiction over a

person found to be a ward or dependent child of the juvenile court until the ward or dependent child attained, at most, 25 years of age or two years from the date of commitment to a secure youth treatment facility pursuant to section 875, whichever occurs later.  (§ 607, subds. (a), (b), and (c).)

Senate Bill 135 expanded the juvenile court's jurisdiction to account for individuals over the age of 25 years:  "The court may retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition if the person is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707.  The court shall exercise jurisdiction in conformance with the objectives of the juvenile court."  (§ 607, subd. (d).)  This amendment was effective September 13, 2023, and was made expressly retroactive under section 607, subdivision (m).

## C.    These Changes in the Law Apply Retroactively

"'It is well settled that a new statute is presumed to operate prospectively'" (*People v. Stamps* (2020) 9 Cal.5th 685, 698), but pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "[n]ewly enacted legislation lessening criminal punishment or reducing criminal liability presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date." (*People v. Gentile* (2020) 10 Cal.5th 830, 852, citing *Estrada, supra*, at pp. 744–745.)  Absent evidence to the contrary, we must assume that an amended statute that mitigates the possible punishment for a class of persons is presumptively retroactive and applies to all persons whose judgments were not final at the time the statute took effect.  (*People v. Frahs* (2020) 9 Cal.5th 618, 624; *Lara, supra*, 4 Cal.5th at pp. 303–304.)

In *Lara*, the court concluded that *Estrada* applied in the context of Proposition 57 because while it did not ameliorate the punishment or possible punishment for a particular crime, it ameliorated the possible punishment for juveniles as a class.  (*Lara, supra*, 4 Cal.5th at p. 308.)  Similarly, the amendments to section 707 brought about by

11.

Assembly Bill 2361 and Senate Bill 545 represent ameliorative changes in the law because those changes "make it more difficult to transfer juveniles from juvenile court, which similarly reduces the possible punishment for juveniles." (*S.S., supra*, 89 Cal.App.5th at p. 1289; accord, *In re Miguel R.* (2024) 100 Cal.App.5th 152, 170 (*Miguel R.*) [concluding Sen. Bill 545 is ameliorative and applies retroactively to nonfinal judgments].)  Senate Bill 135 made the changes it effected expressly retroactive.  As such, we agree with the parties that the changes under these new laws apply retroactively. (§ 707, subd. (a)(3); see *S.S., supra*, at pp. 1288–1289.)

**D. Remedy**

Under the California Constitution, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)  "California law generally interprets its constitutional miscarriage of justice requirement 'as permitting reversal only if the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error [citations].'" (*In re K.H.* (2022) 84 Cal.App.5th 566, 607, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 60 [citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].)  However, "not every error is of the type that lends itself to resolution under [*Watson*'s] likelihood-of-success test [citation]." (*In re K.H., supra*, at p. 608, citing *In re A.R.* (2021) 11 Cal.5th 234, 252–253.)

As the California Supreme Court recently explained in the context of a retroactive change in the law affecting determinate sentencing,[6] "'there is a practical difference in assessing the effect of an error when the court has not articulated whether a discretionary decision was made in the first place, as compared to when there were errors in a decision the court actually rendered.' (*In re F.M.* (2023) 14 Cal.5th 701, 716.) Where … the sentencing court was not aware of the scope of its discretionary powers at sentencing, *Watson* does not properly take into consideration the 'more speculative inquiry' of what choice the court is likely to make in the first instance. (*Ibid.*; accord, *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.) Indeed, when the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing. Accordingly, when … a sentencing court was not fully aware of the scope of its discretionary powers, 'the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion."'" (*People v. Salazar* (2023) 15 Cal.5th 416, 425 (*Salazar*), quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*).) "[W]hen a court has not exercised its informed discretion, remand is the default 'unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion."'" (*Salazar, supra*, at p. 431, quoting *Gutierrez, supra*, at p. 1391.)[7]

---

[6] Senate Bill No. 567 (2021–2022 Reg. Sess.) (amending Pen. Code, §§ 1170 and 1170.1, eff. Jan. 1, 2022).

[7] In *S.S.*, the Court of Appeal found, viewed through the lens of retroactive application of Assembly Bill 2361, that the juvenile court erred in ordering the minor's transfer. (*S.S., supra*, 89 Cal.App.5th at p. 1289.) The court then assessed the error under *Watson* and concluded a miscarriage of justice had occurred. (*Ibid.*) The decision in *S.S.*, however, predated *Salazar*, which addressed the appropriate standard for assessing error where, as here, the appellant is entitled to the retroactive application of ameliorative legislation affecting the scope of the court's

13.

Despite the People's agreement that each of these laws, including Senate Bill 545 and Senate Bill 135, apply retroactively to nonfinal judgments, the People nonetheless maintain Harring has forfeited any claim to a new juvenile transfer hearing because he did not request one at the resentencing hearings in March 2023.

While there were ameliorative changes to section 707 made effective *before* the March 2023 resentencing, there were further relevant, ameliorative changes to sections 607 and 707 *after* the resentencing hearings. The People cite no authority for the proposition that a party can forfeit *future* ameliorative changes in the law, especially changes that may be of even greater benefit to the party. Significantly, as the law provided in March 2023, defense counsel might have reasonably concluded then-existing limitations to a juvenile court's jurisdiction (see § 607, former subd. (c))[8] rendered futile any request for a juvenile transfer/amenability hearing under section 707 with respect to an individual older than 25 years of age, such as Harring who was 43 years old at the time of resentencing. Effective September 13, 2023, Senate Bill 135 expanded the juvenile court's jurisdiction to individuals who, like Harring, are older than 25 years of age. (§ 607, subd. (d) ["The court may retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition"].) At the time of resentencing, Harring had no opportunity to request a juvenile transfer hearing

---

discretion. Relying on *S.S.*, the *Miguel R.* court also applied *Watson* to conclude that retroactive application of Senate Bill 545 did not require remand. Like *S.S.*, the application of *Watson* in this context is out of step with *Salazar*. (See *Miguel R., supra*, 100 Cal.App.5th at pp. 170–171.)

[8]     Section 607, former subdivision (c), stated a juvenile court "may retain jurisdiction over a person who is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707 until that person attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility pursuant to Section 875, whichever occurs later, if the person, at the time of adjudication of a crime or crimes, would, in criminal court, have faced an aggregate sentence of seven years or more." (Stats. 2022, ch. 58, § 38.)

14.

in light of the change in the law effected under Senate Bill 135, and thus forfeiture does not apply.[9]

The juvenile court's original transfer decision in 1997 was necessarily made without the benefit of any of the subsequent ameliorative changes in the law under Proposition 57, Assembly Bill 2361, Senate Bill 545 or Senate Bill 135.[10]  As Harring's judgment is nonfinal, he is entitled to a juvenile transfer hearing conducted by a fully informed juvenile court under the law and jurisdictional scope currently in effect.  (*In re F.M.* (2023) 14 Cal.5th 701, 716; *Salazar, supra*, 15 Cal.5th at p. 425; see *People v. Montes, supra*, 70 Cal.App.5th at p. 48 [conditionally reversing judgment in the context of Pen. Code, § 1170(d)(6), resentencing for retroactive application of Prop. 57 in a new juvenile transfer hearing].)

## II.     Reimposing LWOP Under Penal Code Section 1170(d)(6)

In addition to seeking a new transfer hearing, Harring argues the trial court abused its discretion in reimposing a term of LWOP in resentencing defendant pursuant to Penal Code section 1170(d)(6).  The People maintain Harring forfeited his specific arguments regarding the various factors considered as to resentencing because no objection was made with respect to any of Harring's arguments below.  Even considered on the merits, however, the People argue Harring has failed to establish an abuse of discretion.[11]

---

[9]     As there was no forfeiture, we do not reach Harring's alternative argument his counsel was constitutionally ineffective for failing to request a hearing.

[10]     Although the juvenile court's transfer decision is not contained in the record, the prosecutor's sentencing brief filed with the trial court on January 23, 2023, states that "[o]n December 18, 1997, the juvenile court determined Harring was unfit for juvenile court and transferred the defendant's case to adult court."

[11]     For the reasons explained *post*, we agree with the People on the merits and thus do not reach the issue of forfeiture.

15.

## A. Penal Code Section 1170(d)

Penal Code section 1170(d)(6) provides that a trial court may consider different factors "when determining whether to resentence the defendant to a term of imprisonment with the possibility of parole," which includes whether (1) the defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law (*id.*, subd. (d)(6)(A)); (2) the defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the defendant was sentenced to LWOP (*id.*, subd. (d)(6)(B)); (3) the defendant committed the offense with at least one adult codefendant (*id.*, subd. (d)(6)(C)); (4) prior to the offense for which the defendant was sentenced to LWOP, the defendant had insufficient adult support or supervision and had suffered from psychological or physical trauma or significant stress (*id.*, subd. (d)(6)(D)); (5) the defendant suffers from cognitive limitations due to mental illness, developmental disabilities, or other factors that did not constitute a defense but influenced the defendant's involvement in the offense (*id.*, subd. (d)(6)(E)); (6) the defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing themselves of rehabilitative, educational, or vocational programs, if those programs have been available at their classification level and facility, using self-study for self-improvement or showing evidence of remorse (*id.*, subd. (d)(6)(F)); (7) the defendant has maintained family ties or connections with others through letter writing, calls, or visits or has eliminated contact with individuals outside of prison who are currently involved with crime (*id.*, subd. (d)(6)(G)); and (8) the defendant has had no disciplinary actions for violent activities in the last five years in which the defendant was determined to be the aggressor (*id.*, subd. (d)(6)(H)).

"In addition to the criteria in paragraph (6), the court may consider any other criteria that the court deems relevant to its decision, so long as the court identifies them on the record, provides a statement of reasons for adopting them, and states why the

defendant does or does not satisfy the criteria." (Pen. Code, § 1170, subd. (d)(11).) "The court shall have the discretion to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence. The discretion of the court shall be exercised in consideration of the criteria in paragraph (6).…" (*Id.*, subd. (d)(7).)

## B. Standard of Review

Discretionary sentencing decisions are reviewed for an abuse of discretion. On appeal, it is the appellant's burden to establish an abuse of discretion. (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988.) A judgment or order of a lower court is presumed to be correct on appeal, and all presumptions are indulged in favor of its correctness. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

A trial court abuses its sentencing discretion when its decision is arbitrary or capricious, inconsistent with the letter and spirit of the law, or based on "circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objections, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citations.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.)

17.

"When the sentencing decision involves an assessment of various factors, the trial court has discretion to accord different weight to each factor, and its decision need not be determined by the sheer number of factors on one side or the other. Rather, the trial court's exercise of its sentencing discretion 'requires "[a] quantitative and *qualitative* analysis" of multiple factors. [Citation.]'" (*People v. Willover* (2016) 248 Cal.App.4th 302, 323, quoting *People v. Wright* (1982) 30 Cal.3d 705, 719.)

## C. Trial Court's Reasoning

The trial court explained its reasoning for reimposing a sentence of LWOP as follows:

> "And then [Penal Code section 1170, subdivision (d)(6)] indicates the factors the Court may consider whether to resentence the defendant to a term of prison with the possibility of parole include, but are not limited to, the defendant was convicted pursuant to—that's not true. The defendant does not have felony adjudications assaultive or felony crimes. That's not true we found out. The defendant committed the offense with at least one adult co-defendant. That's not true. Prior to the offense the—was sentenced to [LWOP], the defendant had insufficient adult support or supervision, suffered from psychological or physical, significant stress, or—I think there's some evidence to his upbringing, which is an unfortunate upbringing, but I don't know that it raises to that level.

> "The defendant suffers from cognitive limitations. I'm not sure that that's true. The defendant has performed acts to tend to indicate rehabilitation or the potential for rehabilitation in [California Department of Corrections and Rehabilitation]. There's more to that subdivision. He has done some things, but as [the prosecutor] pointed out, they were late in the process after the law changed, which I don't know if that is surprising or not, but that's the facts.

> "The defendant has maintained family ties or connections. I think he has at some level. No disciplinary action in the last five years. That might be true, but prior to five years he had, and he had some other nonviolent activities in the last five years.

> "As long as this sentence cannot be greater than the initial sentence. I, of course, recognize he was under 26 or he was 17 at the time. I have considered all these factors along with counsel's arguments, and I just don't

18.

see why I would not sentence him to anything less than [LWOP]. This is an unprovoked, heinous crime. Two gentlemen who were trying to better themselves, they were at English class. On their way home, were just brutally—one is brutally murdered. The other one is injured to the point that many, many years later he's still suffering from the affects [*sic*] of that."

**D.     Analysis**

Although the trial court must exercise its discretion "in consideration of the criteria" in Penal Code section 1170(d)(6) (*id.*, subd. (d)(7)), a trial court is not obligated to ascribe any particular mitigating weight to factually supported factors (*id.*, subd. (d)(6) [identifying factors the court "may" consider when determining whether to resentence the defendant to a term of imprisonment with the possibility of parole]). Viewing its reasoning as a whole, the trial court concluded the circumstances of the murder and Harring's prison disciplinary record outweighed the other factors. Harring and three of his cousins (who were all juveniles at the time) approached two brothers walking home from an evening language class and attempted to rob the men. A physical altercation arose, and Harring pulled out a gun and shot at the brothers multiple times. (*Harring I, supra*, 69 Cal.App.5th at pp. 490–491.) Harring was not simply present or involved in the robbery when the killing occurred, he was the actual shooter. The manner of the killing—firing the weapon multiple times and shooting Arnulfo in the head and the neck and Arturo in the arm and chest—was strongly suggestive of express malice and did not tend to connote the killing was an accident or a botched attempt to merely scare the victims to submit to the robbery.

Thus, when the trial court concluded Harring had not been convicted of murder pursuant to theories of felony murder or aiding and abetting (Pen. Code, § 1170(d)(6)(A)), that finding was supported by the record before the trial court. While Harring argues it was possible he was convicted under a theory of felony murder because the murder occurred during the course of a robbery, that argument was never presented to the trial court at the time of resentencing, no objection to the trial court's finding was

19.

made, and there was no factual evidence presented to support a contrary finding. Harring was the actual shooter who was charged with willful, deliberate and premeditated first degree murder with a separate special circumstance felony-murder allegation attached to the first degree premeditated murder charge. A willful killing is one performed with express malice—conviction on a charge of willful, deliberate and premeditated murder requires express malice. (*People v. Moon* (2005) 37 Cal.4th 1, 29 ["[F]irst degree murder requires express malice, and the concept of express malice includes that of willfulness. A willful murder is an intentional murder, and malice is express when there is an intent to unlawfully kill a human being."].) The record does not establish any facts showing the jury was instructed on a felony-murder theory or that the premeditated murder conviction was (or could have been) based on that theory. There was no evidentiary basis for the trial court to find this factor was true and weigh it in favor of a life term with the possibility of parole.

With respect to the second factor identified under Penal Code section 1170(d)(6), it is true that Harring did not have any juvenile felony adjudications for assault or other felony crimes with a significant potential for harm to victims prior to the murder offense. (*Id.*, subd. (d)(6)(B).) This was the crux of our holding in *Harring I* with respect to recall of the sentence under Penal Code section 1170, subdivision (b). When it referenced this factor at resentencing, the trial court noted it was "not true [as] we found out." This appears to have been a misstatement rather than a misunderstanding of the facts. By explaining the factor was "not true [as] we found out," the trial court was referencing *Harring I*, which reversed the trial court's initial determination on this factor with respect to recall of the sentence. In the full context of the two resentencing hearings, it appears the trial court merely misspoke as the statute articulates this factor in the negative— whether the defendant does *not* have certain types of juvenile felony adjudications. (Pen. Code, § 1170(d)(6)(B).)

While the trial court gave this factor no mitigating weight, the statute does not require it to do so. (Pen. Code, § 1170(d)(6).) Further, Harring admitted during his hearing testimony that he had engaged in a physical altercation with the security personnel during a shoplifting crime that resulted in a juvenile felony adjudication for second degree burglary. As Harring *could* have caused injury to a victim during this altercation, there was a basis to afford no mitigating weight to this factor despite that it was true the shoplifting incident had ultimately not resulted in a juvenile felony adjudication for assault or other crime with a significant potential for harm to victims.

As to the factors under Penal Code section 1170(d)(6)(C) and (E), there was no evidence that Harring committed the offense with at least one adult codefendant, nor was there evidence Harring suffered from any cognitive limitations that influenced his involvement in the offense.

Under Penal Code section 1170(d)(6)(D), the trial court was to consider whether prior to the offense for which Harring was sentenced to LWOP, Harring had insufficient adult support or supervision and had suffered from psychological or physical trauma or significant stress. Harring had several difficult childhood experiences, which the trial court recognized. His father had been shot and killed when Harring was young, his mother worked a lot and was absent from the home during those work hours, his stepfather was sent to prison during his childhood, and Harring had to transfer high schools, which precipitated quitting after school sports programs and spending time with peers and relatives who had gang affiliations. The neighborhoods where they lived tended to be dangerous, and Harring recalled being shot at, which was why he started carrying a gun. The trial court took this testimony into account—at the March 7, 2023, hearing the trial court expressly agreed to consider Harring's and his mother's 2019 testimony in conjunction with the resentencing determination. But consideration of these facts did not require the trial court to give them dispositive or great weight in making the sentencing determination.

21.

Harring's childhood was not ideal, particularly given the death of his father, the incarceration of his stepfather and growing up in a difficult neighborhood, but there was no evidence Harring had spent time in foster homes, experienced homelessness, was afflicted with addiction issues, or suffered psychological or physical abuse inside his mother's home or elsewhere. Although his mother was gone during working hours and Harring spent time caring for his younger siblings, the trial court was not compelled to conclude Harring suffered from insufficient adult support or supervision. While reasonable minds could differ about the weight to afford this factor, the trial court's conclusion that this was not a factor that weighed in mitigation was not irrational or outside the bounds of reason.

The trial court acknowledged the evidence of Harring's rehabilitative efforts through prison programs (Pen. Code, § 1170(d)(6)(F)), but the court found those efforts were made only more recently after the law had changed to allow an opportunity for resentencing. Other than his GED, which was completed in 2004, the documentation Harring provided regarding his rehabilitative efforts shows courses and programs completed since 2015. Harring argues the trial court should have given more weight to his testimony that his security classification initially precluded him from participation in most of the available opportunities, and that priority for those types of classes and activities are typically given to inmates with release dates. Fundamentally, Harring's argument is that the trial court should have weighed the facts differently. However, neither Harring's nor another court's disagreement with the trial court's assessment of the factors suffices to demonstrate an abuse of discretion. (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)

In prison, Harring had maintained some family ties or connections with others, as the trial court noted. (Pen. Code, § 1170(d)(6)(G).) He maintained visits with his mother, and he met (and married) his wife while in prison. The trial court implicitly gave this factor less weight when it was balanced against the nature of the murder Harring

22.

committed and his prison disciplinary record. Yet, the trial court was not required to ascribe favorable or dispositive weight to this factor just because there were facts supporting it. The court recognized and considered the factor, but ultimately found it was outweighed. That does not amount to an abuse of discretion. (See *People v. Clair* (1992) 2 Cal.4th 629, 655 [reasonable difference of opinion about how to weigh facts does not establish abuse of discretion].)

Harring's prison disciplinary record between 1998 and 2023 was noted. Although the court recognized Harring had not committed any violent or assaultive attacks in the five years before the 2023 hearing (Pen. Code, § 1170(d)(6)(H)), he had committed a battery on another inmate in 2000 and again in 2011 when he was approximately 31 years old (*id.*, subd. (d)(11)). He was also cited for fighting with other inmates in 2008 (participating in a riot), 2011 (fighting) and 2015 (fighting). Additionally, Harring had multiple violations for other types of disciplinary issues in 2004 (obstructing/delaying officers); 2009 (obstructing peace officer); 2011 (cell phone possession); 2012 (drugs), 2013 (two cell phone possession violations), 2014 (refusing urinalysis and for drug use), and 2015 (drug use). He was cited for additional violations in 2017 for disobeying an order, in 2018 for possessing a cell phone, in 2020 for disobeying an order, and in 2022 for altering personal property. Based on these facts, the trial court's decision to discount the fact Harring had not been disciplined for violent activities in the five years before the hearing was not irrational or outside the bounds of reason.

Finally, Harring argues the trial court erred by failing to expressly discuss the *Miller*[12] factors in reaching its sentencing determination. In *Miller*, the United States Supreme Court held that sentencing schemes that mandate terms of LWOP for juvenile offenders violate the Eighth Amendment because they fail to consider youth-related mitigating factors that may diminish a juvenile's culpability and suggest a capacity for

---

[12]     *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*).

reform. (*Miller, supra*, 567 U.S. at p. 476.) "[U]nder *Miller* a sentencing court considering a sentence of [LWOP] for a juvenile offender must consider evidence that may exist regarding (1) 'a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"'; (2) '"the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"'; (3) '"the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him"'; (4) 'whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"'; and (5) '"the possibility of rehabilitation."'" (*In re Kirchner* (2017) 2 Cal.5th 1040, 1048, quoting *Gutierrez, supra*, 58 Cal.4th at pp. 1388–1389.)

Harring asserts the trial court's failure to expressly discuss the *Miller* factors "violated Harring's Eighth Amendment rights," but changes in the law have mooted this constitutional claim. Effective January 1, 2018, Senate Bill No. 394 (2017–2018 Reg. Sess.) "extend[ed] the availability of a mandatory parole hearing to juveniles sentenced to [LWOP]." (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 850 (*Ochoa*).) This amendment added subdivision (b)(4) to Penal Code section 3051, and permits juveniles serving a life sentence to a parole hearing in their 25th year of incarceration, affording them a meaningful opportunity for release. Thus, they are no longer serving a term of LWOP or its functional equivalent, which effectively moots an Eighth Amendment challenge under *Miller*. (*People v. Franklin* (2016) 63 Cal.4th 261, 279–280 [possibility of release in parole hearing under Pen. Code, § 3051, subd. (b)(3), mooted constitutional claim under *Miller*]; *Ochoa, supra*, at p. 850 [extending mootness principle articulated in *People v. Franklin* to the defendant's claim his LWOP sentence was unconstitutional under *Miller*

24.

in light of Senate Bill No. 394 (2017–2018 Reg. Sess.)]; see *Montgomery v. Louisiana* (2016) 577 U.S. 190, 212 ["A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."].)

Harring's state law challenge to the trial court's exercise of sentencing discretion remains viable, however. (See *People v. Montes, supra*, 70 Cal.App.5th at p. 44 [in Pen. Code, § 1170, subd. (d), resentencing, trial court did not abuse discretion in concluding it was not convinced the defendant's crime was a reflection of the transient immaturity of youth under *Miller*].) In 2014, the California Supreme Court held that Penal Code section 190.5, subdivision (b), which, for defendants like Harring, prescribes a sentence of LWOP or 25 years to life for a 16- or 17-year-old defendant found guilty of special circumstance murder, "authorizes and indeed requires" consideration of the youth-related mitigating factors identified in *Miller* before imposing LWOP on a juvenile homicide offender. (*Gutierrez, supra*, 58 Cal.4th at p. 1387.) This conclusion was grounded in the aggravating and mitigating factors enumerated under Penal Code section 190.3 and the California Rules of Court that a court must consider in sentencing under Penal Code section 190.5, subdivision (b). (*Gutierrez, supra*, at p. 1387.) Specifically, Penal Code section 190.3, subdivision (i), requires the court to consider the age of the defendant at the time of the crime. (*Gutierrez, supra*, at p. 1388.) The court explained this factor permits the sentencing court to consider "not simply a defendant's age but also 'any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty.'" (*Ibid.*, quoting *People v. Lucky* (1988) 45 Cal.3d 259, 302.)

In resentencing Harring to LWOP, the trial court expressly recognized that Harring was 17 years old when he committed the crime, but the trial court made no reference to *Miller.* Thus, on review, we do not have the benefit of a record that provides insight into the details of the court's full evaluation of the *Miller* factors. Yet, at the time of resentencing, the trial court had the benefit of *Miller* and *Gutierrez* and recognized

Harring's youth at the time of the crime. Additionally, defense counsel expressly referenced *Miller* in the resentencing brief and presented arguments about how relevant youth-related factual circumstances warranted a lesser punishment than LWOP. These facts and circumstances of youth were raised again at the hearing, and counsel argued Harring's home life as a juvenile, his juvenile record, the circumstances of his offense, and his rehabilitative efforts in prison all militated a lesser punishment. At defense counsel's request, the trial court agreed to take into account Harring's and Harring's mother's testimony regarding these youth-related factors that had been presented during the 2019 hearing on Harring's petition.

Nothing in the record suggests the court was unaware of the scope of its sentencing discretion or that it failed to consider the *Miller* factors. (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, [the reviewing court] cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of [its] discretion."]; see Cal. Rules of Court, rule 4.409 ["[r]elevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"]; cf. *Ochoa, supra*, 53 Cal.App.5th at p. 853 [remand appropriate where record is ambiguous as to whether court understood its obligation to consider youth-related mitigating factors at sentencing before making discretionary sentencing decision under Pen. Code, § 190.5, subd. (b)].)

Without any indication to the contrary, we are obligated to presume the trial court was aware of its sentencing authority and the scope of its discretion. (*Denham v. Superior Court, supra*, 2 Cal.3d at p. 564 [reviewing court presumes judgment is correct and all presumptions are indulged to support it]; see *People v. Lee* (2017) 16 Cal.App.5th 861, 867 ["[i]f the record is silent" on the court's awareness of its discretionary authority in sentencing, it is presumed the trial court understood the scope of its discretion].) As

26.

such, Harring has not established an abuse of discretion with respect to the court's consideration of the *Miller* factors in reimposing a sentence of LWOP.

### E. Conclusion

As Harring has pointed out, there are facts suggesting the trial court could have exercised its discretion differently. Harring committed the crime with three of his cousins (also juveniles) who apparently had gang affiliations—familial and peer pressures, to which youths are uniquely vulnerable, were arguably involved in the commission of the crime and potentially could have been weighed in Harring's favor when assessing the nature of the crime. Harring's childhood history of losing his father, growing up with only one parent, having relatives with gang affiliations, and living in a higher crime neighborhood could have been viewed as transient and environmental vulnerabilities that led Harring to make impulsive and reckless choices with regard to the crime. (*Miller, supra*, 567 U.S. at p. 476 [among the mitigating qualities of youth are transient qualities of immaturity, irresponsibility, impetuousness, and recklessness and the susceptibility to influence and to psychological damage].) Harring's rehabilitative efforts largely have been made since 2015, but his testimony suggests he was unable to take advantage of programs sooner because of his LWOP status; crediting his testimony, this could signal an authentic desire for rehabilitation. Harring's prison disciplinary record is significant, but he had not been involved in any violent behavior since 2015—eight years prior to the hearing—which could suggest that his participation in programs and education since 2015 have been paying rehabilitative dividends. Harring has maintained contact with his family during his more than two decades in prison, including getting married, also potentially suggestive of maturation and rehabilitation.

These are just some examples of the different ways the trial court could have evaluated and weighed the facts, which in turn could have supported a different conclusion with respect to reimposing a sentence of LWOP. Yet, the trial court's election to weigh and analyze the facts as it did is the "very essence of the exercise of

27.

'discretion'"—the power to make "comparisons, choices, judgments, and evaluations .…" (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 749 [explaining why the exercise of discretion involved in the county's selection of a custodian for potentially dangerous minor is immunized under Gov. Code, § 820.2].)  It bears underscoring that the abuse of discretion standard is deferential, and we review the trial court's decision to determine whether it was "'arbitrary or capricious' or otherwise exceed[ed] the bounds of reason under the circumstances." (*People v. Olguin* (2008) 45 Cal.4th 375, 384, accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 682.)  Neither Harring's nor another court's disagreement with the trial court's decision in this case suffices to demonstrate an abuse of discretion.  (*People v. Carmony, supra*, 33 Cal.4th at p. 377.)

### F.      Remand to a Different Trial Judge is Unwarranted

Harring argues remand to a different trial judge is warranted because the trial court "express[ed] some irritation at the original remand," which, according to Harring, may have colored its resentencing consideration.  We find nothing inappropriate in the trial court's observation at the March 21, 2023, resentencing hearing that "because the Fifth District has ordered a resentencing, recalling and resentencing, it was as if the defendant had never been sentenced before."  Nor was there anything improper in the trial court's acknowledgment that in *Harring I*, we concluded Harring does not have any juvenile felony adjudications for assault or similar crimes with a significant potential for personal harm to victims.  There is no basis to direct that further proceedings be heard before a different trial judge.  (Code Civ. Proc., § 170.1, subd. (c).)

### DISPOSITION

The judgment is conditionally reversed.  The matter is remanded to the superior court with directions to refer the case, within 30 days of the filing of the remittitur, to the juvenile court for a transfer/fitness hearing in accordance with the current law.

If the juvenile court finds by clear and convincing evidence that Harring is not amenable to rehabilitation while under the jurisdiction of the juvenile court, it shall transfer the case to criminal court, which shall then reinstate Harring's sentence.


                                                                 MEEHAN, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.